**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **INTELLECTUAL VENTURES I LLC,** | ) | |
| **and** | ) | |
| **INTELLECTUAL VENTURES II LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Civil Action No. 1:13cv740-AJT-TRJ** |
| | ) | |
| **CAPITAL ONE FINANCIAL** | ) | |
| **CORPORATION, CAPITAL ONE BANK** | ) | |
| **(USA), N.A., AND CAPITAL ONE, N.A.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**DEFENDANTS' OPENING BRIEF IN SUPPORT OF**
**THEIR MOTION TO DISMISS WITH PREJUDICE**

# TABLE OF CONTENTS

I.  INTRODUCTION ....................................................................................................1

II.  LEGAL SECTION.................................................................................................3

    A.  Motion To Dismiss Standard ....................................................................3

    B.  Abstract Ideas Are Not Patent Eligible And Claims Drawn To Them Are Invalid ........................................................................................................4

III.  PLAINTIFFS' CLAIMS CONCERNING THE '701 PATENT SHOULD BE DISMISSED WITH PREJUDICE......................................................................7

    A.  Background Of The '701 Patent ................................................................7

    B.  The '701 Patent Claims An Abstract Idea ................................................8

IV.  PLAINTIFFS' CLAIMS CONCERNING THE '894 PATENT SHOULD BE DISMISSED WITH PREJUDICE....................................................................11

    A.  Background Of The '894 Patent ..............................................................12

    B.  The '894 Patent Claims An Abstract Idea ..............................................13

V.  PLAINTIFFS' CLAIMS CONCERNING THE '137 PATENT SHOULD BE DISMISSED WITH PREJUDICE....................................................................17

    A.  Background Of The '137 Patent ..............................................................17

    B.  The '137 Patent Claims An Abstract Idea ..............................................18

VI.  PLAINTIFFS' CLAIMS CONCERNING THE '382 PATENT SHOULD BE DISMISSED WITH PREJUDICE....................................................................20

    A.  Background Of The '382 Patent ..............................................................20

    B.  The '382 Patent Claims An Abstract Idea ..............................................21

VII.  PLAINTIFFS' CLAIMS CONCERNING THE '587 PATENT SHOULD BE DISMISSED WITH PREJUDICE....................................................................24

    A.  Background Of The '587 Patent ..............................................................24

    B.  The '587 Patent Claims An Abstract Idea ..............................................25

VIII.  CONCLUSION...................................................................................................28

# TABLE OF AUTHORITIES

## CASES

*Bilski v. Kappos*,
  130 S. Ct. 3218 (2010) ...................................................................................... passim

*CLS Bank Int'l v. Alice Corp., Pty.*,
  717 F.3d 1269 U.S. App. LEXIS 9493 (Fed. Cir. May 10, 2013) ........................................ 5, 15

*CyberSource Corp. v. Retail Decisions, Inc.*,
  654 F.3d 1366 (Fed. Cir. 2011) ...................................................................................... passim

*Dealertrack, Inc. v. Huber*,
  674 F.3d 1315 (Fed. Cir. 2012) ...................................................................................... passim

*Diamond v. Chakrabarty*,
  447 U.S. 303 (1980) ...................................................................................... 4

*Fort Props., Inc. v. Am. Master Lease LLC*,
  671 F.3d 1317 (Fed. Cir. 2012) ...................................................................................... passim

*Glory Licensing LLC v. Toys "R" Us, Inc.*,
  No. 09-4252 (FSH), 2011 U.S. Dist. LEXIS 51888 (D.N.J. May 16, 2011) ............................. 3

*Gottschalk v. Benson*,
  409 U.S. 63, 67 (1972) ...................................................................................... passim

*In re Comiskey*,
  499 F.3d 1365 (Fed. Cir. 2007) ...................................................................................... 3

*Laber v. Harvey*,
  438 F.3d 404 (4th Cir. 2006) ...................................................................................... passim

*Lawson v. Miles*,
  No. 1:11cv949 (AJT/IDD), 2012 WL 3242349 (E.D. Va. Aug. 6, 2012) .................................. 3

*Little v. Bank of Am.*,
  769 F. Supp. 2d 954 (E.D. Va. 2011) ...................................................................................... 3

Mayo Collaborative Servs. v. Prometheus Labs., Inc.,
  132 S. Ct. 1289 (2012). ...................................................................................... passim

*Parker v. Flook*,
  437 U.S. 584 (1978) ...................................................................................... 4, 5

*Philips v. Pitt Cnty. Mem'l Hosp.*,
  572 F.3d 176 (4th Cir. 2009) ...................................................................................... 3

DC\2688821.5

*Ultramercial, LLC v. Hulu, LLC*,
No. CV 09-06918 RGK (PLAx), 2010 U.S. Dist. LEXIS 93453 (C.D. Cal. Aug. 13, 2010), *overruled on other grounds*, 2010-1544, 2013 U.S. App. LEXIS 12715 (Fed. Cir. June 21, 2013) .......................................................................................................... 3, 6

iii

## I.    INTRODUCTION

Plaintiffs Intellectual Ventures I and Intellectual Ventures II are in the business of aggregating patents, demanding licensing fees from companies within various business sectors, and using litigation as a tool to force those companies to the bargaining table.   One of the business sectors Intellectual Ventures I and II have attacked is the financial industry, by suing at least ten financial service companies in at least ten different districts around the country. However, legal standards affecting the patentability of financial services patents have evolved since the patents-in-suit issued. This evolution began in 2010 when the U.S. Supreme Court found claims to a method of hedging risks in a financial transaction to be an unpatentable abstract idea in *Bilski v. Kappos*.

While *Bilski* did not hold business method patents *per se* unpatentable, it cast substantial doubt that claims directed to business methods, particularly method claims and claims related to financial services, are patent eligible.   Since then, Federal Circuit cases, including *Cybersource*, *Fort Properties* and *Dealertrack*, have validated that doubt.   In 2012, the U.S. Supreme Court spoke again, in *Mayo*, holding unequivocally that a process focusing on an abstract idea must "also contain other elements or a combination of elements, sometimes referred to as an 'inventive concept,' sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [abstract idea] itself." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1294 (2012).   In 2013, the Federal Circuit, *en banc*, applied *Bilski* and *Mayo* to weigh a risk management patent in *CLS Bank*.   The majority held that all of the method claims were unpatentable.   A majority of the court also agreed that the patentability of the method and system claims should stand or fall together.   Thus, both Supreme Court and  Federal Circuit precedent support finding that those claims are not patentable.

Here, the five patents are asserted against financial services or business methods.  One claims the abstract idea of providing a user with different aliases to use in purchase transactions. Another seeks to claim personalizing what is displayed to a website user to reflect his or her characteristics and prior viewing history.  Another, the abstract idea of using an "identification" code to verify an "account" code before processing a transaction.  A fourth patent claims ownership of the idea of allowing a user to set self-imposed limits on transactions.  And finally, Plaintiffs assert ownership of the idea of organizing scanned images.  The issue is which, if any, of these claims are patentable.

Broadly speaking, the claims of these patents fall into two categories: method and system claims.  The method claims are unpatentable because of the same basic deficiencies in the claims that the U.S. Supreme Court held invalid in *In re Bilski* and that the Federal Circuit sitting *en banc* held invalid in *CLS Bank*.  Just like the claims held patent ineligible in those cases, the claims of the patents-in-suit are directed to an abstract idea and do not add an "inventive concept."  *Mayo*, 132 S. Ct. at 1294.  The patents' claims mesh abstract ideas with field of use restrictions and "well understood, routine, [and] conventional" features or steps, which the Supreme Court has consistently held cannot transform the abstract idea into patentable subject matter.  *Id*. at 1298.

The companion system and apparatus claims in the asserted patents are also unpatentable. The Supreme Court and Federal Circuit have held that abstract ideas cannot be patentable simply because they were re-written into system and apparatus form.  Abstract ideas are not patentable regardless of the form of the claim.  It cannot be that simply adding generic computer components to the claim creates patentability.  Today, all business is done on computers, and to reward claim draftsman's art in this way would simply exalt form over substance.

## II.   LEGAL SECTION

### A.   Motion To Dismiss Standard

"To survive a 12(b)(6) motion, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Lawson v. Miles*, No. 1:11cv949 (AJT/IDD), 2012 WL 3242349, at *2 (E.D. Va. Aug. 6, 2012) (Trenga, J.) (internal quotation marks omitted).   On a motion to dismiss, a court is allowed to consider materials properly submitted as part of the complaint, such as the asserted patents.   *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).   Where a plaintiff attaches documents and relies upon the documents to form the basis for a claim or part of a claim, dismissal is appropriate if the document negates the claim.   *See, e.g.*, *Little v. Bank of Am.*, 769 F. Supp. 2d 954, 963 (E.D. Va. 2011).

Whether a claim recites patent-eligible subject matter under § 101 is a question of law, *see In re Comiskey*, 499 F.3d 1365, 1373 (Fed. Cir. 2007), which is properly resolved on a motion to dismiss.   *See, e.g.*, *Glory Licensing LLC v. Toys "R" Us, Inc.*, No. 09-4252 (FSH), 2011 U.S. Dist. LEXIS 51888, at *18 (D.N.J. May 16, 2011) (granting motion to dismiss for lack of patent-eligible subject matter under § 101); *Ultramercial, LLC v. Hulu, LLC*, No. CV 09-06918 RGK (PLAx), 2010 U.S. Dist. LEXIS 93453, at *20 (C.D. Cal. Aug. 13, 2010) (same), *overruled on other grounds*, 2010-1544, 2013 U.S. App. LEXIS 12715 (Fed. Cir. June 21, 2013). Further, because the failure to claim patent-eligible subject matter cannot be corrected by amending the Complaint, the Complaint should be dismissed with prejudice.   *See Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (leave to amend a pleading should be denied when the amendment would be futile).

### B. Abstract Ideas Are Not Patent Eligible And Claims Drawn To Them Are Invalid

Section 101 of the Patent Act provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." The Supreme Court, in applying § 101 in two recent decisions, reinforced two long-held and overriding legal principles that control the disposition of this motion.

First, the Supreme Court has long recognized that § 101 "contains an important implicit exception" for "laws of nature, natural phenomena, and abstract ideas." *Mayo*, 132 S. Ct. at 1293 (2012) (quotation marks and citations omitted); *see also Bilski v. Kappos*, 130 S. Ct. 3218, 3226 (2010). Abstract ideas are not patentable because "'they are the basic tools of scientific and technological work,'" which are "'free to all men and reserved exclusively to none.'" *Mayo*, 132 S. Ct. at 1293 (quoting *Gottschalk v. Benson*, 409 U.S. 63 (1972) and *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980)). Subject matter falling within this exception is not patent-eligible as a matter of law. *Mayo*, 132 S. Ct. at 1293.

Second, the Supreme Court's unanimous decision in *Mayo* underscores that this principle cannot be circumvented through "'draftsman's art'" by trying to dress up an abstract idea with inconsequential steps. *Id.* at 1294 (quoting *Parker v. Flook*, 437 U.S. 584, 593 (1978)). As the Supreme Court emphasized, the addition of "well-understood," "routine," or "obvious" steps does not transform an unpatentable abstract idea or law of nature into a patentable concept. *Id.* at 1294, 1298. "[T]o transform an unpatentable [abstract idea] into a patent-eligible *application* of such [an idea], one must do more than simply state the [idea] while adding the words 'apply it.'" *Id.* at 1294. In other words, a patent-eligible *application* of an abstract idea must include an "inventive concept" in addition to the abstract idea to be patentable, so that the claim does

"significantly more than simply describe" the abstract idea.  *Id.* at 1294, 1297.  Simply taking an abstract idea and adding steps or structures that are "well-understood," "routine," or "conventional" contributes nothing inventive.  *Id.* at 1294, 1299; *see also Flook*, 437 U.S. at 590. Therefore, it is settled that merely limiting the application of an abstract idea to a particular "field of use or adding token postsolution components"[1] does not convert the idea into a patent-eligible invention.  *Bilski*, 130 S. Ct. at 3231.

The Supreme Court advised that the so-called "machine or transformation test" is "a useful and important clue, an investigative tool," but "not the sole test," for determining whether a given claim satisfies § 101.  *Id.* at 3227.  This test measures whether the claim "(1) is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing."  *Id.* at 3225.  Supreme Court decisions have applied the § 101 test to claims regardless of their statutory class (*i.e.*, process, article of manufacture, apparatus, etc.).  *See, e.g.*, *Benson*, 409 U.S. at 67-68. [2]

Several Federal Circuit decisions applying this precedent track the Supreme Court's approach.  For example, the Federal Circuit held method claims and article of manufacture claims patent ineligible, and thus invalid.  *See, e.g.*, *CyberSource Corp. v. Retail Decisions, Inc.*,

---

[1] The term "postsolution component" denotes inconsequential steps, structures, or applications added to otherwise abstract concepts that do not meaningfully limit the scope of the concept. *Flook*,  437 U.S. at 590.

[2] It should be noted that a recent *en banc* decision reflected disagreement among Federal Circuit judges about the viability of the system/apparatus claims at issue in that case under § 101 principles.  *See generally CLS Bank Int'l v. Alice Corp., Pty.*, 717 F.3d 1269, 2013 U.S. App. LEXIS 9493 (Fed. Cir. May 10, 2013) .  In that decision, a majority found the method claims unpatentable, but split evenly on the patentability of the particular system claims at issue.  *Id.* This left standing the district court's judgment invalidating the system claims, (*id.*), and does not excuse system claims from complying with § 101 – the Federal Circuit's previous cases invalidating analogous system claims still stand.  Regardless, the Supreme Court decision in *Mayo*, holding that "draftsman's art" (such as whether a claim is drafted in system as opposed to method form) does not transform an unpatentable abstract idea into a patentable concept, controls.

654 F.3d 1366, 1375 (Fed. Cir. 2011).  The Federal Circuit also held that an unpatentable principle applied on a computer, or in a computer environment, is not converted into patent-eligible subject matter.  *See, e.g.*, *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012); *Fort Props., Inc. v. Am. Master Lease LLC*, 671 F.3d 1317, 1323 (Fed. Cir. 2012); *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1375 (Fed. Cir. 2011); *see also Bilski*, 130 S. Ct. at 3230.  The sole outlier appears to be *Ultramercial, Inc. v. Hulu, LLC*, where the Federal Circuit reversed the district court's dismissal of a complaint on § 101 grounds.  *Ultramercial, Inc. v. Hulu, LLC*, No. 2010-1544, 2013 WL 3111303, at *6 (Fed. Cir. June 21, 2013).  In that case, however, the Federal Circuit stated that the claims "require[d] intricate and complex computer programming."  *Id.* at *15.  That is not the case here and, in any event, the Federal Circuit's decision in *Ultramercial* cannot override the Supreme Court's pronouncements in cases like *Bilski* and *Mayo.*  Nor can it override the Federal Circuit's decisions in *Dealertrack*, *CyberSource*, and *Fort Properties*, in which the Court concluded that computer-aided elements were generic and/or conventional, and thus were incapable themselves of conferring patentability.

Even in *Ultramercial*, the Federal Circuit acknowledged that claims may be rejected under § 101 at the pleading stage where the only plausible reading of the patent is that there is clear and convincing evidence of ineligibility.  *Ultramercial*, 2013 WL 3111303, at *6.  Because patent eligibility is a coarse gauge of the suitability of the subject matter categories for patent protection, claim construction is not always necessary for a § 101 analysis.  *Id.*  Such is the case here.  In short, whether a claim recites patent-eligible subject matter is a question of law that this Court can and should decide at the initial pleading stage. *Mayo*, 132 S. Ct. at 1293; *Dealertrack*, 674 F.3d at 1333; *CyberSource*, 654 F.3d at 1369.

### III.   PLAINTIFFS' CLAIMS CONCERNING THE '701 PATENT SHOULD BE DISMISSED WITH PREJUDICE

Plaintiffs assert that Defendants infringe "at least claim 5" of U.S. Patent No. 7,664,701. Complaint, ¶ 23 and Exhibit A.  Because the claims of the '701 patent claim the abstract idea of providing a user with different aliases to use in purchase transactions with different vendors, the first claim for relief should be dismissed with prejudice.

#### A.   Background Of The '701 Patent

The '701 patent describes and claims an idea for shielding a user's private billing information, such as his or her credit card information, when engaging in purchase transactions with different vendors.  '701 patent, Abstract; 1:17-20 ("present invention relates to electronic purchases while maintaining privacy of customer billing data"); 2:43-48.  The patent explains that this idea arose from security concerns with online purchases.  Specifically, "thieves have recently begun to attack, to 'hack,' the online commerce sites so as to steal consumer data stored within databases maintained by the business."  '701 patent, at 2:2-5.

The patent posits that a billing service could address these problems by "facilitat[ing] commercial transactions by generating substitute billing data that the client … can use when engaging in commercial transactions with businesses."  *Id.* at 3:8-11.  The billing service would then provide this substitute billing data to the user, who would provide it to a vendor in lieu of a credit card number or other actual billing information when making a purchase.  *Id.* at 3:4-16.

The patent generally describes the implementation of the idea in terms of "clients" ("a computing device, such as a computer, that operates on behalf of a user") and "web sites" ("a general reference to a network 'presence' maintained by a business as well [as] a logical

presence maintained on behalf of a business").  The specification explains that the idea could be implemented in a variety of computing environments.  *Id.* 4:10-17.  The specification also admits that the idea can be implemented on a wide range of user devices.  *Id.* at 2:57-62;  *see also id.* at 7:41-48.

**B.**     **The '701 Patent Claims An Abstract Idea**

The '701 patent includes 18 claims, nine of which are method claims.  Of these, claim 5 is representative.  It reads:

> A method comprising:
>
> a billing service registering a user;
>
> the billing service receiving identification of a first and a second business with which the user intends to conduct one or more purchasing transactions;
>
> the billing service associating a first and a second billing data, that are separate and distinct, with the first and the second business respectively; and
>
> the billing service providing the first and second billing data for use by the user as substitutes for personal billing data for subsequent purchasing transactions.

'701 patent, claim 5.

It is evident that the claim covers nothing more than the abstract idea of providing a user with different aliases to use in purchase transactions with different vendors.  The claim does not require or even reference a computer.  Indeed, the claim can be reduced to the following steps: (1) receiving the identity of two businesses, (2) associating an alias ("billing data") with each of those businesses, and (3)  providing the aliases to the user.  This concept is just as abstract as those held invalid by the Supreme Court in *Bilski* (hedging risk in a computer environment) and *Benson* (converting binary decimal code to binary code), and by the Federal Circuit in *Dealertrack* (implementing a loan clearinghouse in a computer-aided environment), *Fort*

8

*Properties* (dividing an aggregated portfolio of real estate into interests in a computer environment), and *CyberSource* (detecting fraud in credit card transactions by gathering the IP addresses used to make prior purchases with a computer and analyzing them).  Indeed, a simple comparison of the steps of Claim 5 with the steps of the claims found invalid in *Bilski* and *Dealertrack* reveals that Claim 5 should be held invalid as well.

| STEP | '701 Patent, Claim 5 | *In re Bilski* | *Dealertrack* |
|:---:|---|---|---|
| 1 | receiving the identity of two businesses | initiating a series of financial transactions at a fixed rate based on historical averages, where the fixed rate corresponds to a risk position of consumers | receiving data from one source |
| 2 | associating an alias ("billing data") with each of those businesses | identifying market participants having a counter-risk position to those consumers, | selectively forwarding the data |
| 3 | providing the aliases to the user | initiating a series of financial transactions between the consumers and market participants to balance the risk | forwarding reply data to the first source |

*See Bilski*, 130 S. Ct. at 3223-24; *Dealertrack*, 674 F.3d at 1333.

Like the claims in *Bilski* and the Federal Circuit's post-*Bilski* jurisprudence, claim 5 is directed to a patent-ineligible idea.  No computer, machine or other physical structure is identified by the claim as a limitation, or even mentioned in passing.  Likewise, the claim lacks any tie to the professed impetus for the invention (theft of data records generated during transactions with online businesses) or the specific manner in which the patent describes solving this problem.  The claim is so abstract that it could be performed in its entirety during a conversation between two people.  The claimed idea also fails the "machine or transformation test" because it is not tied to any particular machine or apparatus, and it does not transform any

article.  In short, claim 5 falls far short of permissible subject matter.  *See Bilski*, 130 S. Ct. at 3231.

The remaining method claims are invalid for similar reasons.  Claims 6 through 9, which depend from claim 5, merely add additional aliases and routine steps (*e.g.*, providing real time data to an electronic device, receiving notification of a charge).  This is classic "post-solution activity" that cannot transform an unpatentable claim into a patentable one.  *Bilski*, 130 S. Ct. at 3230.  Method claims 1 through 4 merely take the idea reflected in claim 5 and add two field of use restrictions – use of the idea on a generic "electronic device" or "personal digital assistant" and the use of the idea in reference to credit card numbers.  These, too, fail to transform the idea into patentable subject matter.  *Bilski*, 130 S. Ct. at 3231 ("*Flook* established that limiting an abstract idea to one field of use or adding token postsolution components did not make the concept patentable.").

The '701 patent's nine remaining claims fall into two categories: "apparatus" (claims 10 through 16) and "article of manufacture" (claims 17 and 18).  Of these claims, most (claims 10 through 14 and claims 17 and 18) are drafted in so-called "*Beauregard*" format.  As the Federal Circuit explained, this type of claim "is a claim to a computer readable medium (*e.g.*, a disk, hard drive, or other data storage device) containing program instructions for a computer to perform a particular process." *CyberSource*,  654 F.3d at 1373.  The '701 patent's *Beauregard* claims simply take the limitations from the method claims and re-label them as program instructions stored in a storage device or computer readable medium.  *Compare*, *e.g.*, '701 patent claim 10 *with* claim 5.  Similarly, apparatus claims 15 and 16 simply re-label limitations drawn from credit-card method claims as means-plus-function limitations.

"Regardless of what statutory category ('process, machine, manufacture, or composition of matter,' 35 U.S.C. § 101) a claim's language is crafted to literally invoke, [a court] look[s] to the underlying invention for patent-eligibility purposes." *CyberSource*, 654 F.3d at 1374; *see also Mayo*, 132 S. Ct at 1294 (Supreme Court cases "warn us against interpreting patent statutes in ways that make patent eligibility depend simply on the draftsman's art without reference to the principles underlying the prohibition against patents for [abstract ideas]." (internal quotation marks omitted)); *Benson*, 409 U.S. at 67-68.  Like the *Beauregard* claims in *CyberSource*, which the Federal Circuit found invalid, the alleged invention in the apparatus and article of manufacture claims in the '701 patent is the very same abstract idea set forth in the method claims.  And, just as in *CyberSource*, it cannot be argued legitimately that the effort to mesh the abstract idea with computer storage (*Beauregard* claims), or with a broader computing environment (means-plus-function claims), somehow converts this abstract idea into a special-purpose computer that is patent eligible.  These apparatus and article of manufacture claims are simply method claims masquerading as apparatus claims.  They fail under § 101 for the same reasons as the method claims discussed above.  *See, e.g.*, *Mayo*, 132 S. Ct. at 1298; *Bilski*, 130 S. Ct. at 3230-31; *CyberSource*, 654 F.3d at 1372.

Because none of the claims set forth in the '701 patent are directed to eligible subject matter, they are invalid.  Accordingly, the Court should dismiss Plaintiffs' First Claim for Relief and, because any amendment thereto would be futile (each patent claim being invalid), it should do so with prejudice.  *See, e.g.*, *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (noting that leave to amend a pleading should be denied when the amendment would be futile).

## IV.     PLAINTIFFS' CLAIMS CONCERNING THE '894 PATENT SHOULD BE DISMISSED WITH PREJUDICE

11

Plaintiffs assert that Defendants infringe "at least claim 18" of U.S. Patent No. 6,182,894. Complaint, ¶ 35 and Exhibit C.   The '894 patent claims the abstract idea of using an "identification" code to verify an "account" code before processing a transaction.   Its claims are therefore invalid under § 101 and the third claim for relief should be dismissed with prejudice.

## A.   Background Of The '894 Patent

The '894 patent states that  "[t]he present invention relates, generally, to transaction card fraud reduction systems and methods and, more particularly, to verifying that a consumer is in possession of a transaction card and/or is the true care owner during a purchase transaction." '894 Patent at 1:6-11.   The '894 patent asserts that a need for account verification arises from fraudulent use of account numbers, such as credit card numbers.   *Id.* at 1:34-2:40.   Thus, the patent teaches the use of a second "identification number" on a card (instead of a PIN and in addition to an account number) that does not provide automatic access to the account to verify the customer is in possession of the card .   *Id.* at 2:44-53.

The '894 patent describes that the idea is hardware and software independent.   *Id.* at 7:44-64.   In fact, the '894 patent expressly states that "the present invention may be described herein in terms of functional block components … [and that] such components may be realized by any number of hardware components configured to perform the specified function."   *Id.*   For example, it states that a "transaction card" in the examples "includes any device suitably configured to display an account code … and a card identification code."   *Id.* 4:5-7; *see also id.* at 5:17-22.   Similarly, an authorization server used in an authorization system could be "any device suitably configured to authorize a transaction and/or transaction card" and could include "any combination of components, software, servers, and computers."   *Id.* at 5:60-6:6.   Likewise, the idea could be used with any kind of transaction input device.   *Id.* at 5:48-52.

**B.     The '894 Patent Claims An Abstract Idea**

The '894 patent contains eighteen claims: six method claims and twelve system claims.

Claim 18, which is representative of the method claims' style and substance, reads:

> At an authority responsible for authorizing a transaction, a computer-implemented method for handling an authorization request, comprising the following steps:
>
> receiving an n character account code and an n character identification code from an input device, wherein said account code and said identification code have a predetermined logical relationship;
>
> confirming said predetermined relationship between said account code and said identification code; and
>
> processing the authorization request.

'894 patent, claim 18.

This claim simply covers the abstract idea of using an "identification" code to verify an "account" code before processing a transaction. It includes the following steps: (1) receiving an account code and an identification code that have a logical relationship to each other, (2) confirming the logical relationship, and (3) processing an authorization request. In this regard, it is very similar in abstraction to the claims invalidated by the Supreme Court and the Federal Circuit, as a comparison with the steps of *Bilski* and *Cybersource* shows.

| STEP | '894 Patent, Claim 18 | *In re Bilski* | *CyberSource* |
|------|----------------------|----------------|---------------|
| 1 | receiving an account code and an identification code that have a logical relationship to each other | initiating a series of financial transactions at a fixed rate based on historical averages, where the fixed rate corresponds to a risk position of consumers | obtaining credit card information |
| 2 | confirming the logical relationship | identifying market participants having a counter-risk position to those consumers, | verifying the information |
| 3 | processing an authorization request | initiating a series of financial transactions | evaluating the information to provide an indication of |

13

| | | between the consumers and market participants to balance the risk | whether a transaction is fraudulent, |
|---|---|---|---|
| 4 | | | obtaining information about other credit card transactions from the same internet address |
| 5 | | | constructing a map of credit card numbers associated with the address |
| 6 | | | utilizing a map of credit card numbers to determine if the transaction is valid. |

*Bilski*, 130 S. Ct. at 3223-24; *CyberSource*, 654 F.3d at 1373-74.  Likewise, it is similar in abstraction to the claims negated in *Dealertrack* and *Fort Properties*:

| STEP | '894 Patent, Claim 18 | *Dealertrack* | *Fort Properties* |
|---|---|---|---|
| 1 | receiving an account code and an identification code that have a logical relationship to each other | receiving data from one source | aggregating real property into a real estate portfolio |
| 2 | confirming the logical relationship | selectively forwarding the data | dividing the interests in the portfolio into a number of deedshares |
| 3 | processing an authorization request | forwarding reply data to the first source | subjecting those deedshares to a master agreement |
| 4 | | | describing how property can be bought and sold under this arrangement in a manner that permits a tax-deferred exchange |

*Dealertrack*, 674 F.3d at 1333; *Fort Properties*, 671 F.3d at 1322.

Like those claims, claim 18 is simply an abstract idea.  Only two limitations ("input device" and "computer-implemented") even hint at how the idea could be implemented.  But the specification describes an input device as "<u>any device</u> suitably configured to accept transaction information and transmit the information for approval."  '894 Patent at 5:48-50 (emphasis

14

supplied).  And "computer implemented" is both generic and nearly identical to the "computer-aided" language rejected in *Dealertrack*.  *See, e.g.*, *Dealertrack*, 674 F.3d at 1330-31, 1334 (finding claims invalid under § 101 where they "recite only that the method is 'computer aided' without specifying any level of involvement or detail"); *Fort Properties*, 671 F.3d at 1323 (rejecting claims under § 101 where they "only require the computer to 'generate a plurality of deedshares'").  Though the court may have split over the patentability of the specific system claims in *CLS Bank*, nine of the ten judges agreed that a claim is not meaningfully limited when it articulates an abstract idea and simply adds "apply it."  *CLS Bank*, 717 F.3d at – , 2013 U.S. App. LEXIS 9493, at *60 (Judge Lourie opinion joined by 4 other judges) ("The system claims are instead akin to stating the abstract idea of third party intermediation and adding the words: 'apply it' on a computer."); *Id* at*86 (Chief Judge Rader opinion joined by 3 other judges) ("First, we know a claim is not meaningfully limited if it merely describes an abstract idea or simply adds 'apply it.'").  Like the claims at issue in *Dealertrack*, the claims here are "silent as to how a computer aids the method, the extent to which a computer aids the method, or the significance of a computer to the performance of the method."  *Dealertrack*, 674 F.3d at 1333.  The claims at issue in the '894 patent are nothing more than claims to an abstract idea with the words "computer implemented" added – the quintessential "apply it" that nine of the ten Federal Circuit judges rejected in *CLS Bank*.

This conclusion is reinforced by the machine or transformation test.  The claim fails that test because it has no tie to a *particular* machine or apparatus, and performs no transformation of an article.  As *CyberSource* explained, claiming a software or computer implementation of a process that could "otherwise be performed without the use of a computer does not satisfy the machine prong of the machine-or-transformation test."  654 F.3d at 1375.

15

Method claims 10 through 14 simply add post-solution steps (*e.g.*, keying, communicating, and receiving) that were "well understood, routine, conventional activity already engaged in" by those skilled in the art when the patent application was filed and which, "when viewed as a whole, add nothing significant beyond the sum of their parts taken separately." *Mayo*, 132 S. Ct. at 1298.

The twelve system claims also fail under § 101, because they are merely the method limitations rewritten in system form. *Mayo*, 132 S.Ct at 1294 (condemning "draftsman's art" as grounds for patentability). Indeed, system claim 1, which is representative of the twelve system claims in this respect, simply grafts the identification/account codes idea onto a system comprising a "transaction card," an "input device," and an "authorization computer." Likewise, the remaining "system" claims incorporate limitations from the method claims discussed above into this format. *See* '894 patent, claims 1-9 and 15-17. If the specification's description of these components were applied, the "system" would incorporate "any device suitably configured to display an account code … and a card identification code" (transaction card), "any device suitably configured to accept transaction information and transmit the information for approval" (input device), and "any device suitably configured to authorize a transaction and/or transaction card" (authorization server). This language referring to conventional components confirms that the claims are not drawn to a specific computer implementation, but are instead drawn to cover the same abstract ideas as the unpatentable method claims discussed above. *See, e.g.*, *Mayo*, 132 S. Ct. at 1294; *Benson*, 409 U.S. at 67-68; *CyberSource*, 654 F.3d at 1374.

Because none of the claims set forth in the '894 patent is directed to eligible subject matter, each is invalid and Plaintiffs' Third Claim for Relief should be dismissed with prejudice. *Laber*, 438 F.3d at 426.

**V.    PLAINTIFFS' CLAIMS CONCERNING THE '137 PATENT SHOULD BE DISMISSED WITH PREJUDICE**

Plaintiffs assert that Defendants infringe "at least claim 18" of U.S. Patent No. 8,083,137. Complaint, ¶ 41 and Exhibit D.  Because the '137 patent's claims are drawn to the abstract idea of allowing a user to set self-imposed limits on transactions, they are invalid under § 101 and the fourth claim for relief should be dismissed with prejudice.

**A.    Background Of The '137 Patent**

The '137 patent explains that "it is easy, and all too prevalent, that along with [the] popularity and ease of use of most point of sale credit facilities, comes financial difficulty for many people." '137 Patent, at 1:20-23.  To address this problem, it suggests the idea of allowing users to set self-imposed limits on transactions.  *Id.* at 1:65-67.

The specification explains that this idea can be implemented in a variety of ways.  For example, the user could be notified that a self-imposed limit has been reached "before, during, or after the point of sale transaction."  *Id.* at 2:1-4.  The notification could "be delivered, if desired, by the account clearing network and printed on the user's purchase receipt," or "via a phone call, email or over an Internet connection to the user."  *Id.* at 2:4-6.  The limits could be hard limits – for example, a limit on transactions that cannot be exceeded by a particular account user.  *Id.* at 2:58-62.  Or they could be soft – post-transaction notices that limits have already been exceeded, or the ability to check the running total in a given category of transactions.  *Id.* at 2:1-18.

The specification posits that the idea could be used for a variety of accounts.  *Id.* at 9:24-29.  Users could use a variety of technologies to access their transaction limit information.  *Id.* at 5:48-6:3.  And limits, which are incorporated into a user's profile, could be stored in a variety of ways, including on a transaction card, a smart card, or in a "database."  *Id.* at 5:5-7, 5:41-47.

17

B.     **The '137 Patent Claims An Abstract Idea**

The '137 patent contains three independent claims: one method and two system claims.

Method claim 12 reads:

> A method comprising:
>
> storing, in a database,  a profile keyed to a user identity and containing one or more user-selected categories to track transactions associated with said user identity, wherein individual user-selected categories include a user pre-set limit; and
>
> causing communication, over a communication medium and to a receiving device, of transaction summary data in the database for at least one of the one or more user-selected categories, said transaction summary data containing said at least one user-selected category's user pre-set limit, and wherein said transaction summary data is configured to be presented by the receiving device in a table.

'137 patent, claim 12.

This claim is drawn to the abstract idea of allowing a user to set self-imposed limits on transactions.  Indeed, it consists of the following steps: (1) storing a user profile that contains one or more user-selected categories including a pre-set limit, and (2) communicating transaction summary data, including the user's pre-set limit, for at least one of the categories.  These steps are equally abstract as the steps of the claims that *Bilski* and *Dealertrack* rejected, and should be invalidated, as well:

| STEP | '137 Patent, Claim 12 | *In re Bilski* | *Dealertrack* |
|:---:|---|---|---|
| 1 | storing a user profile that contains one or more user-selected categories including a pre-set limit | initiating a series of financial transactions at a fixed rate based on historical averages, where the fixed rate corresponds to a risk position of consumers | receiving data from one source |
| 2 | communicating transaction summary data, including the user's pre-set limit, for at least one of the categories | identifying market participants having a counter-risk position to those consumers, | selectively forwarding the data |

18

| 3 | | initiating a series of financial transactions between the consumers and market participants to balance the risk | forwarding reply data to the first source |
|---|---|---|---|

*Bilski*, 130 S. Ct. at 3223-24; *Dealertrack*, 674 F.3d at 1333.

Terms such as "database," "communication medium," "receiving device," and "table" do not transform the abstract idea into patentable subject matter.  Each of these elements refers to "well-understood, routine, conventional" components that, "when viewed as a whole, add nothing significant beyond the sum of their parts."  *Mayo*, 132 S. Ct. at 1298.  Such elements, termed "post-solution activity" by the Supreme Court, are insufficient to render the claim patentable.  *Id.*; *see also CyberSource*, 654 F.3d at 1372 ("even if some physical steps are required to obtain information from the database (e.g., entering a query via a keyboard, clicking a mouse), such data-gathering steps cannot alone confer patentability").

The machine or transformation test leads to the same result, because the claim is not tied to any *particular* machine or apparatus and does not result in a transformation of any article.  This is illustrated by the nature and function of these elements – they have no role in the claim, apart from storing and communicating elements reflecting the abstract idea.  In other words, just as they are well-understood, routine, conventional and not "inventive," in *Mayo*'s language, these components do not enhance or integrate with the abstract idea in a way that would require the claim to *particular* machines.  *See, e.g.*, *CyberSource*, 654 F.3d at 1375.  For the same reason, they are not "inventive."  *Mayo*, 132 S. Ct. at 1298.

The remaining method claims add no limitations conferring patentability.  Claims 13 through 15, which depend from claim 12, add specificity to the types of information provided about user-selected categories (*e.g.*, purchasable items falling within a category, sub-user

transaction data).  But, like the user-selected data of claim 12, they are purely abstract and, in at least one case ("purchasable items"), directed to a field of use.  Claims 16 through 18, which also depend from claim 12, simply specify the type of communication medium – network, wireless, or cellular.   Whether viewed as field of use restrictions, or post-solution activity, these limitations do not confer patentability.  *Mayo*, 132 S. Ct. at 1298.  Independent method claim 5 actually *subtracts* a limitation (presentation in a table) from claim 12 but is otherwise the same, and the method claims depending from it (claims 6-11) merely add the same dependent limitations discussed above with respect to claim 12.

The nine system claims repackage the method limitations in "system" form and refer back to well-known, routine, and conventional structures described in the specification.  *See, e.g.*, '137 patent, Claim 1.  They are thus not meaningfully different from the method claims and are unpatentable for the same reasons.  *See, e.g.*, *Mayo*, 132 S. Ct at 1294, 1298; *Benson*, 409 U.S. at 67-68, 71; *CyberSource*, 654 F.3d at 1374.

Consequently, none of the '137 patent claims is directed to eligible subject matter.  The Fourth Claim for Relief should be dismissed with prejudice.  *Laber*, 438 F.3d at 426.

## VI. PLAINTIFFS' CLAIMS CONCERNING THE '382 PATENT SHOULD BE DISMISSED WITH PREJUDICE

Plaintiffs assert that Defendants infringe "at least claim 1" of U.S. Patent No. 7,603,382.  Complaint, ¶ 29 and Exhibit B.  The '382 patent claims the abstract idea of personalizing a website display to reflect the user's characteristics and navigation history.  Because it is directed to ineligible subject matter, the second claim for relief should be dismissed with prejudice.

### A. Background Of The '382 Patent

The '382 patent states that "the invention pertains to a system for selectively tailoring information delivered to an Internet user depending upon the particular needs of the user."  '382

Patent at 1:17-19.  More specifically, the '382 patent explains that the user could create a profile (or profiles) containing demographic and other information.  *Id.* at 3:40-4:26, 6:18-25.  The website provider could then use that information to determine what content should be shown to the user. *See, e.g.*, *id.* at 5:4-28, 6:18-38.  In addition, the user's website interface could "map the route which the user has gone" to access the website, or could "map the entire website," and display that information along with the webpage.  *Id.* at 6:46-58.

But while the patent goes to great lengths to describe various ways in which profiles could be personalized, the results of personalization, and the benefits of mapping, it says little – from a technical standpoint – about how one skilled in the art could implement any aspect of this idea.  The '382 patent, for example, does not describe the hardware or software used by the user or the website provider to implement the invention.  The strong conviction one has from reading the specification is that this is a conceptual, "paper" patent.  That conviction is borne out by the claims.

### B. The '382 Patent Claims An Abstract Idea

The '382 patent has four independent claims.  Three are method claims; one is styled as a system claim.  Claim 21 is representative of the method claims' content.  It reads:

A method comprising:

receiving data from a user profile associated with a user;

in response to a request associated with the user, sending a data stream that is selected based at least in part on the received data from the user profile; and

displaying the data stream via an interactive interface, the interactive interface comprising:

a display depicting portions of a web site visited by the user as a function of web site navigation data; and

21

> a display depicting portions of the web site visited by the user based at least in part on the received data from the user profile.

'382 patent, claim 21.  Claim 7, another independent method claim, focuses on one part of the idea: providing different data streams of information based on the user's profile.  *Id.* at claim 7.  Claim 16, the other independent method claim, simply adds a "storing" step to claim 21. *Id.* at claim 16.  The seventeen dependent method claims merely add focus to some aspects of the basic idea (*see, e.g.*, claims 8-15 (listing types of data to be displayed, such as a company logo)).

In substance, the claims cover nothing more than the abstract idea of personalizing a website display to reflect the user's characteristics and navigation history.  They include some or all of the following steps: (1) receiving data from a user profile, (2) storing that data, (3) sending content based, at least in part, on the user's profile data, and (4) displaying that content via an interactive interface in which some content is selected based on the user's web navigation history and the user's profile data.  This idea is no less abstract than those held invalid by the Supreme Court and the Federal Circuit, as a comparison to the steps of the claims invalidated in *CyberSource* and *Fort Properties* shows:

| STEP | '382 Patent, Claim 21 | *CyberSource* | *Fort Properties* |
|------|------------------------|----------------|--------------------|
| 1 | receiving data from a user profile | obtaining credit card information | aggregating real property into a real estate portfolio |
| 2 | storing that data | verifying the information | dividing the interests in the portfolio into a number of deedshares |
| 3 | sending content based, at least in part, on the user's profile data | evaluating the information to provide an indication of whether a transaction is fraudulent | subjecting those deedshares to a master agreement |
| 4 | displaying that content via an interactive interface in which some content is selected based on the user's web navigation history and the user's profile data | obtaining information about other credit card transactions from the same internet address | describing how property can be bought and sold under this arrangement in a manner that permits a tax-deferred exchange |

| 5 | | constructing a map of credit card numbers associated with the address | |
| 6 | | utilizing a map of credit card numbers to determine if the transaction is valid | |

*CyberSource*, 654 F.3d at 1373-74; *Fort Properties*, 671 F.3d at 1322. Just like those invalidated claims, the '382 patent's method claims cover an abstract idea and are invalid.

That these claims refer to "an interactive interface," "web sites," "web pages" and to "a display" does not change this conclusion. Rather, these terms simply refer to aspects of the abstract idea itself, which is the personalization of a website display to reflect the user's characteristics and navigation history. *See, e.g.*, *Benson*, 409 U.S. at 63. Moreover, these claim elements are the same kind of "well-understood, routine, conventional" structures, termed "post-solution activity," and "field of use limitations" that the Supreme Court has repeatedly held are insufficient to transform an abstract idea into patentable subject matter. *See, e.g.*, *Mayo*, 132 S. Ct. at 1298; *Bilski*, 130 S. Ct. at 3230-31; *see also CyberSource*, 654 F.3d at 1372.

The machine or transformation test leads to the same conclusion: the claimed idea is not tied to any *particular* machine or apparatus and it does not transform any article into a different state or thing. Here, too, these elements do not change, or focus, or enhance the abstract idea; and the idea as set forth in the claim does not depend on *particular* machines. Consequently, it does not satisfy the test. *See, e.g.*, *CyberSource*, 654 F.3d at 1375.

The system claims (claims 1 through 6), which simply re-write limitations from the method claims into system format, fare no better. *See, e.g.*, '382 patent, Claim 1. As an initial matter, that the claims have been restyled as "system" claims has no material effect on the analysis. *Mayo*, 132 S. Ct at 1294; *Benson*, 409 U.S. at 67-68; *CyberSource*, 654 F.3d at 1374.

And because they incorporate only conventional and well-known structures that add nothing of substance to the abstract idea, the system claims fail for the same reasons as the method claims. *Mayo*, 132 S. Ct. at 1298; *Bilski*, 130 S. Ct. at 3230-31; *see also CyberSource*, 654 F.3d at 1372.

In sum, the '382 patent claims the abstract idea of personalizing a website display to reflect a user's characteristics and navigation history. As such, the claims are invalid under § 101 and Plaintiffs' Second Claim for Relief should be dismissed with prejudice. *Laber*, 438 F.3d at 426.

## VII. PLAINTIFFS' CLAIMS CONCERNING THE '587 PATENT SHOULD BE DISMISSED WITH PREJUDICE

Plaintiffs assert that Defendants infringe "at least claim 18" of U.S. Patent No. 7,260,587. Complaint, ¶ 47 and Exhibit E. The '587 patent claims the abstract idea of organizing scanned images. Accordingly, its claims are invalid under § 101 and the fifth claim for relief should be dismissed with prejudice.

### A.   Background Of The '587 Patent

The '587 patent observes that, historically, many people took many photographs, but largely stored the prints in a random way in various containers, such as shoeboxes. '587 patent, at 1:39-53. With the advent of digital photography, some attempts have been made to organize digitally-taken images, but this has not translated into ways of organizing pre-existing hard-copy photographs. *Id.* at 1:55-59. To address this issue, the '587 patent suggests that hardcopy images could be scanned and organized in electronic form. *Id.* at 1:35-37.

After providing a long list of ways that images could be organized, the patent explains that "[a]ny one or a combination of these characteristics could be used for automatic grouping and/or sorting of the images." *Id.* at 14:41-43. "[I]t is to be understood that any appropriate software program for organizing and/or reorganizing images may be appropriately used" to

organize images. *Id.* at 16:37-39. Once organized, electronic images could be stored on a variety of devices. *See, e.g.*, *id.* at 15:17-35 (identifying "image storage and retrieval device, a device for printing images onto a media, including but not limited to photosensitive media … a device for making a computer disk, a compact disk or other digital storage device").

**B.   The '587 Patent Claims An Abstract Idea**

All 18 of the claims are method claims. Claim 18, which is representative, reads:

> A method of automatically organizing digital images obtained from a plurality of hard copy prints, comprising the steps of:
>
> obtaining hard copy prints from a plurality of different sources, each of said hard copy prints having an image thereon;
>
> digitally scanning a plurality of hard copy prints each having an image thereon wherein said plurality of hard copy prints have been grouped together into one or more categories, each category being associated with an instruction form to create digital image files of said images and obtaining associated category information for said digital images in accordance with said machine readable instruction executed by a computer
>
> automatically grouping said digital image files into said categories in accordance with said instructions; and
>
> storing the digital image files and said associated category on a digital storage medium.

'587 patent, claim 18.

The claim sets forth the abstract idea of organizing scanned images. Indeed, just like the claims in *Bilski*, it simply breaks this idea into a serious of routine steps, including: (1) obtaining hard-copy prints with images from different sources that have been grouped into different categories, (2) scanning them, (3) grouping the scanned images into the same categories as the hard-copy images were grouped, and (4) storing the categorized images. The level of abstraction is similar to that of the claims in *Bilski* and *Fort Properties*, as the following comparison shows:

| STEP | '587 Patent, Claim 18 | *In re Bilski* | *Fort Properties* |
|---|---|---|---|
| 1 | obtaining hard-copy prints | initiating a series of | aggregating real property |

| | | | |
|---|---|---|---|
| | with images from different sources that have been grouped into different categories | financial transactions at a fixed rate based on historical averages, where the fixed rate corresponds to a risk position of consumers | into a real estate portfolio |
| 2 | scanning the prints | identifying market participants having a counter-risk position to those consumers, | dividing the interests in the portfolio into a number of deedshares |
| 3 | grouping the scanned images into the same categories as the hard-copy images were grouped | initiating a series of financial transactions between the consumers and market participants to balance the risk | subjecting those deedshares to a master agreement |
| 4 | storing the categorized images | | describing how property can be bought and sold under this arrangement in a manner that permits a tax-deferred exchange |

*Bilski*, 130 S. Ct. at 3223-24; *Fort Properties*, 671 F.3d at 1322.  Like the claims in *Bilski* and *Fort Properties*, claim 18 consists of an abstract idea.

The fact that the claims require that the steps are "in accordance with said associated machine readable instruction for executed on a computer" does not change that.  The recitation of a generic "computer" or generic "machine readable instructions" is not an "inventive concept."  These limitations refer only to a general purpose computer, and are exactly the type of "well-understood," "routine," and "obvious" that the Supreme Court held do not transform an unpatentable abstract idea into a patentable invention.  *Mayo*, at 132 S. Ct. at 1294, 1298; *Benson*, 409 U.S. at 71 (the process for converting binary coded decimal numerals into pure binary numerals on a general purpose computer was not patentable).

This is true, despite the fact that the claim includes terms like "automatically," "hard copy prints," and "instruction form."   "Automatically" does not change the character or

substance of this claim because the term implicates well-understood and routine components, and because it is consistently used to refer to a step in the process that occurs after the images have been scanned – the images are by this time electronic and reside in automated system. *See, e.g.*, *Mayo*, 132 S. Ct at 1298; *Benson*, 409 U.S. at 71. Nor do "hard copy prints" or "instruction form" transform the claim into an application of the abstract idea. *Fort Properties*, 671 F.3d at 1322 (noting that "the claims in *Bilski* were tied to the physical world through at least two tangible means: commodities and money"). Finally, the reference to "storing … on a digital storage medium" is both generic (*see Fort Properties*, 671 F.3d at 1323; *Dealertrack*, 674 F.3d at 1333) and refers to post-solution activity (*Mayo*, 132 S. Ct. at 1298).

For the same reasons illustrated by *Fort Properties*, *Benson* and *Bilski*, the claim fails the machine or transformation test: the claim lacks any tie to a *particular* machine and fails to transform any article. These claims are not tied to a *particular* machine because they do not specify a particular type of hardware or a particular type of software or perform any transformation. *See Benson*, 409 U.S. at 64. Consequently, the claim fails the test. *See, e.g.*, *Benson*, 409 U.S. at 71; *CyberSource*, 654 F.3d at 1375.

The other method claims, including the dependent claims, simply add additional post-solution activity (*e.g.*, making products from the pictures, specifying the type of product made, and specifying that the instruction form contains additional or personal information about some of the images) that is likewise insufficient to change an unpatentable abstract idea into a patentable application of the idea. *Mayo*, 132 S. Ct. at 1298.

Each of the claims of the '587 patent is invalid because none is directed to eligible subject matter, and Plaintiffs' Fifth Claim for Relief should consequently be dismissed with prejudice. *Laber*, 438 F.3d at 426.

## VIII.   <u>CONCLUSION</u>

For the reasons outlined above, the Court should dismiss Plaintiffs' Complaint, in its entirety, with prejudice.


Dated:  July 29, 2013

**CAPITAL ONE FINANCIAL CORPORATION**
**CAPITAL ONE BANK (USA), N.A.**
**CAPITAL ONE, N.A.**


  /s/ Nicholas R. Klaiber
Robert A. Angle (VSB No. 37691)
robert.angle@troutmansanders.com
Dabney J. Carr, IV (VSB No. 28679)
dabney.carr@troutmansanders.com
Nicholas R. Klaiber (VSB No. 80563)
nicholas.klaiber@troutmansanders.com
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-1246
Facsimile: (804) 698-5124

Mary Catherine Zinsner (VSB No. 31397)
mary.zinsner@troutmansanders.com
TROUTMAN SANDERS LLP
1660 International Drive, Suite 600
McLean, VA 22102-3805
Telephone: 703-734-4334
Facsimile: 703-734-4340

Matthew J. Moore (*pro hac vice*)
matthew.moore@lw.com
Abbott B. Lipsky, Jr. (*pro hac vice*)
tad.lipsky@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C.  20004-1304
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201

Jeffrey G. Homrig (*pro hac vice*)
jeff.homrig@lw.com
LATHAM & WATKINS LLP

DC\2688821.5

140 Scott Drive
Menlo Park, CA  94025-1008
Telephone: (650) 328-4600
Facsimile:  (650) 463-2600

Joseph H. Lee (*pro hac vice*)
joseph.lee@lw.com
LATHAM & WATKINS LLP
650 Town Center Drive, 20th Floor
Costa Mesa, CA  92626-1925
Telephone: (714) 840-1235
Facsimile:  (714) 755-8290

Neil A. Rubin (*pro hac vice*)
neil.rubin@lw.com
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, CA  90071-1560
Telephone: (213) 485-1234
Facsimile:  (213) 891-8763

Andrew J. Fossom (*pro hac vice*)
andrew.fossum@lw.com
LATHAM & WATKINS LLP
811 Main Street, Suite 3700
Houston, TX  77002
Telephone: (713) 546-7449
Facsimile: (713) 546-5401

*Attorneys for Defendants, Capital One Financial*
*Corporation, Capital One Bank (USA), N.A. and*
*Capital One, N.A.*

DC\2688821.5

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 29th day of July, 2013, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF System, which will then send a notification of

such filing (NEF) to the following:


Clayton Thompson, VSB No. 41962
Ian F. Feinberg, Cal. Bar No. 88324
M. Elizabeth Day, Cal. Bar No. 177125
Marc C. Belloli, Cal. Bar No. 244290
Yakov Zolotorev, CA Bar No. 224260,
Feinberg Day Alberti & Thompson LLP
1600 El Camino Real, Suite 280
Menlo Park, CA 94025
(650) 618-4364 (T)
(650) 618-4368 (F)
cthompson@feinday.com
ifeinberg@feinday.com
eday@feinday.com
nbelloli@feinday.com
yzolotorev@feinday.com

*Counsel for Plaintiffs Intellectual Ventures I LLC*
*and Intellectual Ventures II LLC*


  /s/ Nicholas R. Klaiber_____

Robert A. Angle (VSB No. 37691)
robert.angle@troutmansanders.com
Dabney J. Carr, IV (VSB No. 28679)
dabney.carr@troutmansanders.com
Nicholas R. Klaiber (VSB No. 80563)
nicholas.klaiber@troutmansanders.com
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-1246
Facsimile: (804) 698-5124

DC\2688821.5