IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| INTELLECTUAL VENTURES I LLC, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) |
| CAPITAL ONE FINANCIAL CORPORATION, *et al.*, | ) ) ) |
| Defendants. | ) ) ) |

Civil Action No.  1:13-cv-00740 (AJT/TRJ)

## MEMORANDUM OPINION

On June 19, 2013, Intellectual Ventures I, LLC and Intellectual Ventures II, LLC (collectively, "Intellectual Ventures") filed suit against Capital One Financial Corporation, Capital One Bank (USA), National Association and Capital One, National Association (collectively, "Capital One") alleging patent infringement.  In response to plaintiffs' complaint, Capital One filed its Answer and First Amended Counterclaims [Doc. No. 88], in which it asserted a defense alleging "patent misuse" (the "Eighth Defense") based on the antitrust laws and also added as counterclaim defendants a group of entities affiliated with Intellectual Ventures (collectively, with Intellectual Ventures, referred to as "IV").  Counts 11, 12 and 13 of the Amended Counterclaims assert antitrust claims under Section 2 of the Sherman Antitrust Act and Section 7 of the Clayton Act.

IV has filed a Motion to Strike or Dismiss Amended Antitrust Counterclaims 11, 12, and 13 and Eighth Affirmative Patent Misuse Defense (the "Motion to Dismiss") [Doc. No. 104] and also an alternative Motion for Separate Trial on Antitrust and Patent Misuse Issues and to Stay

1

Discovery on Those Issues [Doc. No. 112].  A hearing was held on these motions on November 15, 2013, following which the Court took these motions under advisement.  By Order dated December 5, 2013 [Doc. No. 151], the Court granted IV's Motion to Dismiss [Doc. No. 88] and denied as moot its Motion for Separate Trial on Antitrust and Patent Misuse Issues and to Stay Discovery on Those Issues [Doc. No. 112].  The Court now issues this Memorandum Opinion in further support of its Order.

## I. Allegations Concerning Patent Misuse and Monopolization.

In its Eighth Defense, Capital One alleges patent misuse based on (1) the impermissible collection of royalties from invalid patents and (2) unlawful monopolization.  In its First Amended Counterclaims, Capital One alleges (1) monopolization under Section 2 of the Sherman Act (Count 11); (2) attempted monopolization under Section 2 of the Sherman Act (Count 12); and (3) unlawful asset acquisition in violation of Section 7 of the Clayton Act (Count 13).  Capital One makes essentially the same allegations in support of both its patent misuse defense and its antitrust counterclaims, summarized as follows.

IV is a patent assertion entity ("PAE"), more commonly known as a "patent troll."  It holds a portfolio of approximately 80,000 patents and patent applications, the world's largest, including 3,500 patents applying to the "technology market for financial institutions." Amend. Answer and Counterclaims at 26 ¶ 62.  IV has no commercial purpose[1] other than to engage in the "'submarine' hold-up" of innovators like Capital One that provide goods and services to consumers.  *Id.* at 27 ¶ 63.  It accomplishes its anticompetitive business objectives through

---

[1] IV "neither commercializes technology nor builds products, but instead merely accumulates vast numbers of patents and patent applications." *Id.* at 26 ¶ 62.

"[s]ecrecy, misdirection, and obfuscation," including through the use of a "labyrinthine network of some 2000 shell companies." *Id.* These shell companies conceal IV's patents so that "targets have no idea that it is building walls of patents around their businesses" and then "when [IV] does launch its attack, its targets cannot assess or value its portfolio and thus among other things cannot determine whether they could avoid [IV]'s infringement claims by redesigning their accused products or processes." *Id.*

IV targets almost exclusively the "*ex post*" licensing market for "technology enabling business processes common throughout the commercial banking industry in United States" (that is, after companies have already made their investments in technological solutions), as opposed to the "*ex ante*" technology licensing market (where companies assess competing technological solutions before making investments, based on known patents and the available licensing terms). *Id.* at 27 ¶ 64-65. Whereas the *ex ante* licensing markets are generally competitive and efficiently distribute technology that benefits "downstream consumers who enjoy superior products at reduced cost," the *ex post* licensing market exploited by IV involves "innovators who have already built products and services incorporating widely known technologies." *Id.* at 27-28 ¶ 65. "By this [*ex post*] stage, companies have sunk large investments (many of them long length, fixed capital assets, often without any significant alternative use) into their product lines, meaning they can no longer cheaply abandon their chosen product designs." *Id.* For these reasons, "[e]x post, makers and buyers of technological products, are to a significant degree, locked-in, which makes them attractive targets for [IV]'s litigation scheme for extracting supracompetitive licensing fees through coercion and deception." *Id.* at 28 ¶ 65.

Overall, IV "knows or should reasonably know that many if not most of the 3,500 patents in its financial services patent portfolio are irrelevant, invalid, not infringed, and/or unenforceable," and "due to their probable invalidity, and the risk of countersuit to those who might enforce them, such patents provide their owners with no market power." *Id.* at 13, 29 ¶ 68. Nevertheless, "the possible irrelevance, invalidity, and unenforceability of the patents in [IV]'s financial services portfolio is not an impediment to [IV's] strategy because, unlike a bona fide portfolio licensing, [IV]'s business model is not based on the licensing of valuable patent rights, rather on the threat of asserting thousands of patents in a never-ending series of costly and disruptive patent infringement lawsuits – pummeling its victims into submission." *Id.* at 12. These threats of litigation are made more credible because IV "is not itself subject to such infringement allegations from members of the financial services industry whom it attacks." *Id.* For these reasons, "… the very traits that rendered those patents invalid make them attractive to IV, which realizes that, by combining enough of them, it can make sweeping claims of infringement" and as a result, IV has the ability to "turn straw into gold" and "acquire[] monopoly power where there was previously none." *Id.* at 14, 29 ¶ 68-69. "[IV] creates an inescapable threat by aggregating so many weak patents that it can attack successful products and redesigned alternatives. [IV] thus eliminates competition and cuts off escape avenues for the innovators it attacks." *Id.* at 29 ¶ 69.

IV implements its scheme through "sham litigation in bad faith, regardless of the relevance, validity, enforceability of patents or the likelihood of success on the merits at trial, with the intent of using the federal court process, as opposed to the outcome of that process, as an anti-competitive weapon to increase pricing power in the relevant market." *Id.* at 17. It

4

pursues "meritless patent claims" against Capital One and other U.S. commercial banks "without any realistic expectation of actually securing damages or other relief, i.e., motivated by a desire to impose collateral, anticompetitive injury, rather than to obtain a justifiable legal remedy." *Id.* at 32-33 ¶ 74. "Through threats and lawsuits, [IV] is forcing and seeking to force U.S. commercial banks, including Capital One, to license vast patent portfolios that likely include hundreds if not thousands of patents – including the Patents-in-suit – that do not read on the products and/or services offered by such financial institutions and that are of doubtful validity and enforceability." *Id.* at 12. IV's "campaign of extraordinary patent accumulation and litigation [has] … no cognizable procompetitive justification and lacks any efficiency-enhancing effects sufficient to outweigh its enormous anticompetitive impact." *Id.* at 33 ¶ 75. As a result of IV's scheme, "[IV] has thus impermissibly broadened the scope of the patents in suit by using them to obtain a market benefit, beyond that which inheres in the statutory patent right, for exclusionary purposes and in a manner that has substantial anticompetitive effects." *Id.* at 14.

The anti-competitive effects of IV's conduct are far-reaching and severe. First, "[b]y forcing its victims to either face endless, costly and disruptive patent litigation or accept licenses to thousands of potentially irrelevant, invalid, and/or unenforceable patents, [IV] eliminates the economic incentive of its coerced licensees to challenge the validity of individual patents within the portfolio, and causes anticompetitive effects contrary to public policy." *Id.* at 13. Second, it reduces the incentive to innovate, since "[c]ompanies such as Capital One foresee that if they achieve success by selling a product with enough revenue to attract [IV], [IV] will seek to 'tax' it." *Id.* at 17. Third, IV has "repeatedly demonstrated its power to raise prices for its portfolio of patents by successfully charging supra-competitive royalties without suffering loss of demand or

5

sales toward other licensors." *Id.* at 14.  Rather, its extracted royalties, reflecting the "'hold-up'

value" of the patents rather than their economic worth, will cause an increase in prices to

consumers, a reduction in the rewards for successful innovation, and a decline in the quantity,

quality and rate of innovation; the future "inputs" into the innovation process are restricted, and

the costs of commercial banking operations are increased.  *Id.* at 33 ¶ 76.

As a result of IV's tactics and strategies, U.S. commercial banks, such as Capital One,

have no real economic choice other than to capitulate to IV's unreasonable and anticompetitive

demands.  IV "creates an inescapable threat" and "cuts off escape avenues for the innovators it

attacks."  *Id.* at 29 ¶ 70.  "In the face of these anticompetitive practices, a rational financial

services target would more likely than not pay for limited patent peace, even if [IV] does not

have a single valid and infringed patent in its financial services portfolio."[2]  *Id.* at 16.

By being forced to operate under constant threat of "hold-up," Capital One specifically

has been injured in its business and property by IV's anticompetitive conduct, thereby

endangering Capital One's "future design freedom, cash resources and investment in innovation,

and burdening its management time and other resources in defending itself in this action and in

the future."  *Id.* at 34 ¶ 78.

---

[2] Capital One alleges that as a result of its scheme, IV has "reportedly extracted $350 million
from Verizon Communications, for instance, $120 million from Intuit Inc., and between $200
million to $400 million from Cisco Systems, Inc." *Id.* at 29 ¶ 70.

## II. Analysis

A.    **Count 11 of the First Amended Counterclaim: Monopolization under Section 2 of the Sherman Act.[3]**

"The offense of monopolization under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-571 (1966).

As to the first element, monopoly power in a relevant market, a plaintiff must generally allege monopoly power in both the relevant product market and the relevant geographic market in which trade was unreasonably restrained or monopolized. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011). Monopoly power is generally viewed as the power to control prices or exclude competition. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). It may be proven either through "direct evidence of supracompetitive prices and restricted output" or by inference "from the structure and composition of the relevant market." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007). A relevant market is generally viewed as the field of "meaningful competition." *IGT v. Alliance Gaming Corp.*, 702 F.3d 1338, 1344 (Fed. Cir. 2012). It is determined by "commercial realities" and "consumer choice" and, while it typically includes substitutes for a

---

[3] A preliminary issue is whether Capital One has sufficiently alleged the requisite "antitrust injury" in order to have standing for its monopolization claims. *See Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 310 (4th Cir. 2007) ("In a private antitrust action, a plaintiff must go beyond a showing that it meets the Article III standing requirements of injury, causation, and redressability; it must also demonstrate 'antitrust standing.'"). Given the Court's rulings herein, there is no need for this Court to decide this substantial issue.

particular product, it may also consist of a single product or brand where there is no "reasonable interchangeability" with other comparable products, that is, where there are essentially no substitutes for a given product. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 481-82 (1992) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. at 404). In any event, relevant market definition is typically a fact-intensive inquiry, not amenable to definitive assessment at the pleadings stage, although dismissal is appropriate when the pleadings contain "glaring deficiencies." *Kolon Indus.*, 637 F.3d at 443.

Capital One alleges that IV has monopolized the "...ex post market for technology used to provide commercial banking services in the United States." Mem. in Opp. at 2; *see also* Answer and First Amend. Counterclaims at 30 ¶ 71 (alleging the relevant market is the "market for technology enabling business processes common throughout the commercial banking industry in the United States, where the relevant geographic market is nationwide."); Tr. at 29 (the relevant market is "*ex post* technology markets going after commercial banking services."). In proposing this relevant market, however, Capital One does not allege any of the recognized indicia of a relevant market. It does not allege that the proposed market consists of an "area of effective competition" between IV and the commercial banks who are the alleged victims of IV's anticompetitive conduct. *See Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1353 (Fed. Cir. 1999) (defining the relevant product market as "the area of effective competition" between the parties). It does not allege that this proposed market contains all, or even any, of the available substitutes for the technologies included within that proposed market or that the included technologies all pertain to the same aspects of the commercial banking operations, or even to those at issue in this case. Rather, as best as the Court can discern, Capital One's proposed

8

technology market equates to IV's "portfolio of 3,500 or more patents that [IV] alleges cover widely used financial and retail banking services" in the United States because IV's patent portfolio presents an "inescapable threat" to providers of financial services.[4]  Answer and First Amend. Counterclaims at 30 ¶ 72.

Because Capital One cannot avoid IV's patent claims and is therefore "locked-in" to dealing with those claims in some fashion, Capital One likens its proposed market to the relevant market in *Kodak, Qualcomm* and *Meredith Corp. v. SESAC, LLC,* 2011 WL 856266 (S.D.N.Y. Mar. 9, 2011).  In those cases, the patents, copyrights or product lines at issue were controlled by a single company and the customers were "locked in" to those particular patents, copyrights or replacement parts, without the availability of substitutes.[5]  The concepts and holdings of those cases, however, cannot be extended to the proposed market in this case.  First, in each of those cases, there was no dispute as to the validity or enforceability of the underlying patent or

---

[4] As Capital One argued at the hearing on this Motion, "[w]e're not saying they're the only patents that relate to commercial banking services," but instead that "[t]he commercial reality faced by Capital One is you can't get around this market." Tr. at 33-34.

[5] *See Kodak,* 504 U.S. at 482, 497 (quoting *U. S. v. E. I. du Pont de Nemours & Co.,* 351 U.S. at 404) ("That [relevant] market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered," but "[b]ecause service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines."); *Qualcomm,* 501 F.3d at 315 (the complaint sufficiently alleged that Qualcomm possessed monopoly power in the relevant market, because the cellular technology to which Qualcomm held the patent was embedded in the applicable operational standard and therefore "essential" and "not interchangeable with or substitutable for other technologies," such that those using that technology had been "locked in" because the patented technology had been incorporated into the standard.); *SESAC,* 2011 WL 856266 at *3, *5 (the relevant market was "the market for performance rights to the copyrighted material in the SESAC repertory," because SESAC required a blanket license for all of its copyrighted materials, even if those stations required the performance rights for even one of the copyrighted songs.)

copyrights; and the relevant market was defined in terms of what was a business necessity for the complaining businesses' lawful operation.[6] Here, Capital One, understandably, does not define the relevant market, as in *SESAC, Kodak* and *Qualcomm*, in terms of what is needed to lawfully operate its business. Indeed, Capital One effectively alleges there is no commercial market for IV's patent portfolio; and Capital One's relevant market reduces to what IV relies upon to justify its allegedly extortionate demands to buy "patent peace" and avoid the paralyzing costs of "wave after wave of burdensome and expensive litigation." Amend. Answer and Counterclaims at 16; Mem. in Opp. at 3. The only "business necessity" alleged is, in essence, the business need to avoid future litigation. Likewise, under Capital One's monopolization claims, the actual technologies included within the proposed market, within broad limits, appear nearly irrelevant, since it is not the substantive, commercial usefulness or the merits of the technology that defines the market; but simply the patents in that market used to threaten Capital One, which consist entirely of IV's patent portfolio. Only in that sense are there no "substitutes" for the patents that IV controls and uses to threaten and coerce the commercial banks. In short, Capital One's proposed market is not a "relevant market" under any recognized antitrust jurisprudence.

Even assuming that Capital One has proposed an appropriate "relevant market" consisting of the *ex post* market for technologies used to provide commercial banking services in the United States, Capital One has failed to allege facts that make plausible its claim that IV

---

[6] For example, there was no dispute that the patent at issue in *Qualcomm* or the copyrights at issue in *SESAC* were valid and enforceable, or that the Qualcomm patent and at least some of the copyrights in SESAC were required for the lawful operation of the complaining businesses. Likewise, the replacement parts and services in *Kodak* were a business necessity for those who had purchased Kodak equipment. Here, by contrast, Capital One disputes the validity, enforceability and commercial usefulness of the IV patents asserted in this action, as well as those included in IV's patent portfolio.

wields unlawful monopoly power within that market. Capital One does not allege IV's share of that market, and it purports to rely exclusively on what it characterizes as "direct evidence" of market power, namely "supracompetitive prices and restricted output." *See Qualcomm*, 501 F.3d at 307. But, again, Capital One provides nothing other than conclusory allegations that IV has demanded and received "supracompetitive prices." Capital One has not alleged any specific license fees or royalties that IV has demanded from any commercial banks or that those banks have paid. While Capital One has alleged overall amounts that IV has "extracted" from various non-banking companies outside the relevant market alleged, it does not identify any specific license fees that IV has demanded or received from commercial banks, or why those amounts are unlawfully "supracompetitive." Capital One does not allege specifically that IV charges or demands license fees higher than other patent holders. More basic still, there are no facts or allegations that explain why IV's alleged "supracompetitive prices" reflect unlawful monopoly power within the context of IV's right to license its patents. *See Brullote v. Thys Co.,* 370 U.S. 29 (1962) (a patent "empowers the owner to exact royalties as high as he can negotiate with the leverage of that monopoly."); *F.T.C. v. Actavis, Inc.*, 133 S. Ct. 2223, 2231 (2013) ("[A] valid patent excludes all except its owner from the use of the protected process or product. And that exclusion may permit the patent owner to charge a higher-than-competitive price for the patented product.") (citing *United States v. Line Material Co.*, 333 U.S. 287, 308 (1948)). Presumably, under Capital One's theory of monopolization, supracompetitive license fees may be obtained by patent holders so long as they are not induced by threats of "endless litigation." But, Capital One does not explain, and the Court does not understand, how threats of litigation to enforce presumably valid patents can render unlawful license fees that would otherwise be lawful.

11

The second element of a Section 2 claim—willful acquisition or maintenance of monopoly power—effectively requires the use of monopoly power "to foreclose competition, to gain a competitive advantage or to destroy a competitor." *United States v. Griffith*, 334 U.S. 100 (1948), cited in *Kodak*, at 482-83. It requires that a defendant engage in anticompetitive conduct in order to achieve or sustain its monopoly. "Such conduct must affect the relevant product market, that is, the area of effective competition between the defendant and plaintiff." *Intergraph Corp*, 195 F.3d at 1353. Capital One's Section 2 claim fails for several reasons with respect to this element of its claim.

First, IV does not allege that Capital One and IV compete with each other in the relevant market. In fact, Capital One's theory of monopolization is that IV not only does not compete, it also does not engage in any commercial operations at all. Second, there are no allegations, with or without factual support, that IV seeks "to foreclose competition, to gain a competitive advantage or to destroy a competitor." Rather, the "anticompetitive conduct" that Capital One alleges consists of certain conduct the effects of which are felt "in the aggregate." In this regard, Capital One alleges that IV threatens to enforce patents, whose enforcement, outside of their inclusion in IV's portfolio, would not be economically sensible. Lacking, however, is any fact-based explanation concerning why IV's acquisition of presumed valid patents becomes unlawful or at what point IV's enforcement of multiple patents becomes unlawful monopoly power. *See Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2245 (2011) (citing to 35 U.S.C. § 282 for the proposition that patents are presumed valid); *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1204 (2d Cir. 1981) (discussing that the acquisition of patents alone is not unlawful); *Ethyl Gasoline Corp. v. United States*, 309 U.S. 436, 456 (1940) ("...patent law confers on the patentee a limited

12

monopoly, the right or power to exclude all others from manufacturing, using or selling his invention.").

Imbedded in Capital One's theory of liability is that it is impossible to determine, before it commits to technological solutions, which publicly disclosed patents may be infringed by its technological choices.[7]  It candidly concedes that, as a practical matter, it has implemented its technological solutions based on the assumption that its potential legal exposure for patent infringement can be ignored, or later managed economically, since an individual patent holder would typically lack the resources or the economic incentive to enforce a single or limited number of patents against a commercial bank.  In a sense, Capital One complains that IV's strategy to enforce patents in an economically sensible way has upended its business expectations and business calculus; but the Court knows of no antitrust jurisprudence that would translate that strategy into antitrust liability.

Central to Capital One's theory of monopolization is that IV has engaged in or threatens to engage in "sham litigation" to enforce a patent portfolio whose patents are, in fact, either unenforceable or so weak that, absent IV's "hold-up," they have limited commercial value. However, Capital One does not allege any specific litigation history to support that claim or identify any particular patents IV has attempted or threatened to enforce that have expired, been cancelled or adjudicated to be invalid.  Further, as noted above, IV and Capital One do not compete in any relevant market, so it cannot be said that IV's object is to use this or any other litigation to interfere with the business relationships of a competitor.  For these reasons, among

---

[7] Capital One argues that "…even the most assiduous innovators dedicated to obtaining necessary licenses before researching and developing novel products cannot avoid arguable claims of patent infringement in the ex-post market."  *Id.* at 28 ¶ 66

others, Capital One has not alleged facts or circumstances that would plausibly place this litigation within any recognized exception to the *Noerr-Pennington* doctrine, which protects private parties from antitrust liability based on even unsuccessful litigation attempts to enforce laws with potential anti-competitive effects. *See Eastern RR Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965); *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972).[8] Capital One's theory of monopolization based on coerced settlements also collides to a large extent with the strong public policy in favor of settling disputes. *Hemstreet v. Spiegel, Inc.*, 851 F.2d 348, 350 (Fed. Cir. 1988) ("The law strongly favors settlement of litigation..."). In any event, in the end, Capital One's claim of monopolization reduces simply to IV's alleged ability, with its economic resources and patent portfolio, to credibly threaten serial litigation, not for the purpose of enforcing its patents, but rather to bludgeon Capital One into a licensing agreement that could not otherwise be obtained or justified based on the merits of its patents, were they to be dispersed individually among many holders.[9]

It can be imagined that, at some point, were IV to engage in the kind of endless, unsuccessful litigation described by Capital One, IV would incur legal liability; but the antitrust laws appear ill suited as a remedy for what Capital One fears, and relief for any such liability

---

[8] The "sham" proceeding exception to *Noerr-Pennington* applies where a suit is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" and there is evidence of subjective intent to use the litigation process to interfere with a competitor's business. *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 60, 60-61 (1993).

[9] Capital One relies heavily on the general pronouncements in *F.T.C. v. Actavis, Inc.*, 133 S. Ct. 2223 (2013), but the conduct addressed in that case, which restrained competition in a particular market, as between would-be competitors, beyond the rights conferred by a particular patent, has little, if any, similarities to the conduct alleged in this case.

14

would more likely come through various doctrines of tort liability, statutory fees or judicial sanctions. *See, e.g., Bull v. McCuskey*, 96 Nev. 706, 709, 615 P.2d 957, 960 (1980), overruled in part on other grounds by *Ace Truck v. Kahn*, 103 Nev. 503, 746 P.2d 132 (1987) (finding that it was permissible for the jury to find that plaintiff had engaged in abuse of process where plaintiff brought a malpractice suit with the ulterior purpose of coercing a nuisance claim settlement.) *See also In re Kunstler*, 914 F.2d 505, 518 (4th Cir. 1990) (Fed. R. Civ. P. 11 provides for sanctions based on improper purpose, such as to extort a settlement or improper license fee, where a party files a pleading without a true intent to vindicate its rights or pursue the matter); and 35 U.S.C. § 285 (providing the court with the ability to award reasonable attorney fees to the prevailing party in "exceptional cases").

For the above reasons, Capital One has failed to allege facts that make plausible its claim that IV has engaged in monopolization in violation of Section 2 of the Sherman Antitrust Act. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

**B.      Count 12 of the First Amended Counterclaim: Attempted Monopolization under § 2 of the Sherman Act.**

Establishing attempted monopolization requires proof "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). "[D]emonstrating the dangerous probability of monopolization in an attempt case also requires inquiry into the relevant product and geographic market and the defendant's economic power in that market." *Id.* at 459. Capital One's attempted

15

monopolization claim alleges the same injury, and in the same fashion, as its monopolization claim in Count Eleven, and fails to state a claim for the same reasons.

C.     **Count 13 of the First Amended Counterclaim: Unlawful Asset Acquisition under § 7 of the Clayton Act.**

Section 7 of the Clayton Act proscribes a corporation from acquiring the assets of another corporation where "the effect of such acquisition . . . may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. Capital One alleges that IV "has amassed a financial services patent portfolio of extraordinary breadth," which portfolio "has been aggregated primarily through acquisition by IV of assets, namely patents and exclusive patent licenses." Answer and Amend. Counterclaims at 36 ¶ 89. Further, Capital One alleges that "[t]hese asset acquisitions are likely to lessen substantially, and indeed already have lessened substantially, competition in the [relevant] market," and "are likely to create, and indeed already have created, a monopoly in the relevant market." *Id.* ¶ 90.

Section 7 of the Clayton Act can be applied to the acquisition of patents. *See, e.g.*, *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1210 (2d Cir. 1981). However, in the patent context, § 7 addresses only those situations in which the *acquisition* of a patent substantially lessens competition, and not situations in which anticompetitive effects arise at some point after the acquisition. *Id.* at 1211-12 ("Where a corporation's acquisition of a patent is not violative of § 7 . . . its subsequent holding of the patent cannot later be deemed violative of this section."); *see also Brown Shoe Co. v. United States*, 370 U.S. 294, 317-18 (1962) (noting that the purpose of § 7 of the Clayton Act was to arrest acquisitions with anticompetitive effects in their "incipiency"). Here, Capital One does not allege that IV's acquisitions, standing alone, have lessened competition as if, for example, IV had acquired all substitutes or competing technologies.

16

Rather, the alleged anticompetitive effects, as Capital One explains, arise from IV's litigation threats, based on the patents it has accumulated, and the settlements that result from those litigation threats.  In other words, the complained of anticompetitive effects do not arise from the acquisition of the patents, but from conduct that post-dates the acquisition.  As with its monopolization claims, Capital One fails to allege any facts, including the identity of any particular patents or when they were acquired, that make plausible its claim that the effect of IV's patent acquisition ". . . may be substantially to lessen competition, or to tend to create a monopoly."

## D.   Patent Misuse Defense

In *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318 (Fed. Cir. 2010), the Federal Circuit surveyed the history and development of the patent misuse defense, its purpose and its limitations.  Patent misuse is a narrow doctrine and requires conduct that has the effect of increasing the physical or temporal scope of the patent at issue.  *Id.* at 1328-1331.  In the licensing context, the doctrine limits a patentee's right to impose conditions on a licensee that exceed the scope of the patent right.  *Id.* at 1321.  Moreover, "[w]hile proof of an antitrust violation shows that the patentee has committed wrongful conduct having anticompetitive effects, that does not establish misuse of the patent in suit unless the conduct in question restricts the use of that patent and does so in one of the specific ways that have been held to be outside the otherwise broad scope of the patent grant."  *Id.* at 1329; *see also C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1372 (Fed. Cir.1998) ("The defense of patent misuse arises from the equitable doctrine of unclean hands, and relates generally to the use of patent rights to obtain or to coerce an unfair commercial advantage"; and "[p]atent misuse relates primarily to a

17

patentee's actions that affect competition in unpatented goods or that otherwise extend the economic effect beyond the scope of the patent grant."). Ulterior or bad motives do not deprive a patent holder of its right to enforce a patent; and a patent misuse defense cannot be based on "misuse in the air." Rather, "[t]he misuse must be of the patent in suit." *See Princo Corp.,* 616 F.3d at 1329 (citing *Kolene Corp. v. Motor City Metal Treating, Inc.,* 440 F.2d 77. 84 (6th Cir. 1971) and *McCullough Tool Co. v. Well Surveys, Inc.,* 395 F.2d 230, 238–39 (10th Cir. 1968).

Capital One has failed to allege facts that make plausible its patent misuse defense, as that defense has been explained by the Federal Circuit or the U.S. Supreme Court. *See F.T.C. v. Actavis, Inc.,* 133 S. Ct. at 2231 (finding that supracompetitive licensing fees are permissible based on a patent's monopoly power, so long as the license actually applies to products or processes which fall within the patent). The concept of patent misuse is premised on the existence of an enforceable patent, and the use of the monopoly power that accompanies such a patent, to extract concessions that exceed the temporal or subject matter scope of that monopoly power. Here, Capital One's theory of patent misuse is not that IV has demanded concessions beyond the monopoly power created by an enforceable patent, such as demanding illegal product tying arrangements in unpatented goods or requiring licensing fees after the expiration date of its patents. Indeed, Capital One denies the enforceability of IV's patents. Rather, Capital One is claiming that IV is engaging in patent misuse by attempting to enforce, in the aggregate, patents that individually, or in limited numbers, would not likely be asserted or licensed. But even were IV requiring, by way of settlement, the licensing of its entire portfolio of patents, as Capital One seems to allege, that policy would not appear to constitute patent misuse. *See Princo Corps.* at 1324 (noting its previous ruling that "including additional patents in the package was the

18

functional equivalent of promising not to sue licensees on any of the patents in the group, which had the advantages of minimizing transaction costs and ensuring against the risk of post-agreement disputes as to whether those additional patents were required to practice the patented technology."). In any event, Capital One has not alleged any facts pertaining to the terms or conditions that IV has demanded with respect to licenses for the patents-in-suit (or any of IV's other patents, for that matter) that would fall within the ambit of any recognized patent misuse defense. Nor, for the reasons previously stated, has Capital One sufficiently alleged any antitrust violations, let alone antitrust violations that would translate into patent misuse, *see id.* at 1332 ("...the use of funds from a lawful licensing program to support other, anticompetitive behavior [such as the sharing of royalties to a competitor to suppress competition] is not the kind of 'leveraging' that the Supreme Court and this Court have referred to in discussing the leveraging of a patent that constitutes patent misuse."); or any facts that would make unlawful or improper IV's otherwise lawful attempts to accumulate and enforce patents. *See Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1558 (Fed. Cir. 1997) ("[a]cquisition of and enforcement of a patent do not in and of themselves constitute patent misuse."), abrogated on unrelated grounds by *Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448 (Fed. Cir. 1998).

Although Capital One stresses that IV's actions must be viewed in the aggregate, its patent misuse defense, like its antitrust claims, essentially rests on its allegation that IV credibly threatens to enforce, in piecemeal fashion, "thousands of patents in a never-ending series of costly and disruptive patent infringement law suits." Answer and Amend. Counterclaims at 12. That allegation, however, even were it supported by facts, does not establish that IV has or will

attempt to enforce its patents beyond their temporal or physical scope. *Id.* at 14.  For all of these reasons, Capital One fails to allege facts sufficient to make plausible its defense of patent misuse.

For the above reasons, as set forth in its Order dated December 5, 2013 [Doc. No. 151], plaintiff's Motion to Strike or Dismiss Amended Antitrust Counterclaims 11, 12, and 13 is GRANTED and those counterclaims are DISMISSED, its Eighth Affirmative Patent Misuse Defense [Doc. No. 104] is STRIKEN and its Motion for Separate Trial on Antitrust and Patent Misuse Issues and to Stay Discovery on Those Issues [Doc. No. 112] is DENIED as moot.

The Clerk is directed to forward copies of this Memorandum Opinion to all counsel of record.

Anthony J. Trenga
United States District Judge

Alexandria, Virginia
December 18, 2013