UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| INTELLECTUAL VENTURES I LLC, *et al.*, )<br><br>*Plaintiffs* )<br><br>*v.* )<br><br>CAPITAL ONE FINANCIAL CORP., *et al.*, )<br><br>*Defendants* ) | Case No. 1:13cv740<br>(AJT/TCB) |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
<u>MOTION FOR SUMMARY JUDGMENT</u>**

## I.      INTRODUCTION

Capital One's motion should be denied in full.  First, Capital One's Section 101 and Section 112 invalidity arguments were previously rejected on Capital One's pleadings motions. Second, Capital One's assertion that the so-called Visa patent or '275 Patent anticipates the '137 patent fails because, looking within the four corners of the reference as this Court must, the reference does not disclose significant limitations.  Third, Capital One's non-infringement defenses with respect to the '137 and '382 patents are riddled with factual issues that preclude summary judgment.

## II.     DISPUTED MATERIAL FACTS[1]

**IV's Response to Capital One's Alleged Undisputed Fact No. 1**:  IV does not dispute that the VISS website is operated and maintained by Visa, however Capital One facilitates and encourages use of VISS by Capital One.  Ex. 1, 2/14/14 Expert Report of John Hiles Regarding Infringement at ¶¶ 370-372; Ex. 3, 2/28/14 Rebuttal Expert Report of John Hiles Regarding Infringement at ¶ 263.

**IV's Response to Capital One's Alleged Undisputed Fact No. 2**:  Capital One UDF 2 is irrelevant as shown below in IV opposition to Capital One's request for summary judgment concerning the "merchant category" function.

**IV's Response to Capital One's Alleged Undisputed Fact No. 6**:  Aside from the typographical error in Capital One's identification of 35 U.S.C. § 102(e), IV does not dispute UDF 6.

**IV's Response to Capital One's Alleged Undisputed Fact No. 8**:[2] IV does not dispute

---

[1] IV does not dispute the following UDFs:  3-5, 7, 9-10, 15-23, and 25-26.

UDF 8, but IV does dispute ¶¶ 19, 27-28 of the 2/28/14 Rebuttal Expert Report of Robin

O'Connell Regarding Validity of U.S. Patent No. 8.083,137.  Mr. O'Connell's statements

regarding a purported "project" or "system" at Visa allegedly related to the '275 patent is

irrelevant and does not form part of the disclosure of the '275 patent.  Capital One Motion, Ex.

H, 2/28/14 Rebuttal Expert Report of Robin O'Connell Regarding Validity of U.S. Patent No.

8.083,137 ¶¶ 18-21.

Further, Mr. Connell's statement that "[t]he web interface would then retrieve the

requested data from **_the database_**, as disclosed in the Visa patent" is contrary to the disclosure of

the '275 patent.  *See* Capital One Motion, Ex. H, ¶ 27 (emphasis added).[3]  Similarly, the '275

patent does not disclose that "information about transactions" is stored or retrievable from the

APT database of the '275 patent.  Specifically, the '275 patent discloses that transaction data is

retrieved from the issuer bank network, 18, otherwise identified as the "issuer financial

institution (FI)."  '275 patent, col. 2:55-60; Ex. 5, Phillips Dep. (Rough) at 140:2-15; 147:17-

149:16; 193:7-20.  The '275 patent never describes the data, or transaction details, as being

stored or retrieved from the APT database.  Ex. 2, 2/14/14 Expert Report of John Hiles

Regarding Validity at ¶¶ 55 ("[T]here is no teaching in Kemper that there is any transaction

summary data in any database."); Ex. 5, Phillips Dep. (Rough) at 177:6-14.

Contrary to Mr. O'Connell's statement at ¶ 28, the '275 patent does not tie activity

reports with "transaction details or other account information" because the "transaction details or

other account details" are sourced from the issue FI.  '275 patent, col. 5:4-10.  Capital One

further extrapolates beyond the '275 patent by articulating that the '275 patent states that the

---

[2] IV has filed a motion to strike the untimely O'Connell Report (ECF No. 255). The motion is
denied, subject to the Court determining whether to rely on it in support of Capital One's motion
for summary judgment. IV renews its objection to this evidence.

[3] The '275 patent is attached as Ex. E to Capital One's Motion.

activity reports include "a comparison of transactions for a given merchant type against the limit for a merchant category." *See* Capital One Motion, Ex. H, ¶ 28.  This example is nowhere articulated in the '275 patent.  Ex. 2, 2/14/14 Expert Report of John Hiles Regarding Validity of U.S. Patent No. 8,083,137 at ¶¶ 55-56; Ex. 5, Phillips Dep. (Rough) at 195:7-11, 200:19-201:17.

**IV's Response to Capital One's Alleged Undisputed Fact No. 11**:  IV does not dispute UDF 11, but as discussed in response to UDF 8, IV does dispute that the '275 patent supports the statements made in paragraphs 27 and 28 of the 2/28/14 Rebuttal Expert Report of Robin O'Connell Regarding Validity of U.S. Patent No. 8,083,137.

**IV's Response to Capital One's Alleged Undisputed Fact No. 12**:  IV does not dispute UDF 12, but IV disputes any implication that the APT database of the '275 patent is disclosed as storing "transaction details and other account information" that are described as maintained by the transaction network and issuer FI.  '275 patent, col. 2:65-67; 5:3-7; Ex. 5, Phillips Dep. (Rough) at 140:2-15; 147:17-149:16; 193:7-20.  The transaction details are only sent to the authorization subprocessor after a transaction is approved by the normal authorization process within the issuer bank network or issuer financial institution.  '275 patent, col. 1:38-45; 3:26-38. The APT database does not store transaction details.  Ex. 2, 2/14/14 Expert Report of John Hiles Regarding Validity of U.S. Patent No. 8,083,137 at ¶¶ 55-56: Ex. 5, Phillips Dep. (Rough) at 150:14-25; 169:12-20; 173:17-174:9; 175:3-177:1; 182:3-16.

**IV's Response to Capital One's Alleged Undisputed Fact No. 13**:  IV does not dispute that Figure 4(c) of the '275 patent shows an example of a web interface that allows for setting categories and limits in an APT in a database, but the web interface of Figure 4(c) is not disclosed as being used for "accessing transaction summary data."  '275 patent, Figure 4(c). Figure 4(c) does not show any "transaction details" or "transaction summary data," and instead

shows only user account controls related to budgeting and buttons for accessing e-mail alerts and activity reports. '275 patent, Figure 4(c). The '275 patent does not provide any figure describing the e-mail alert or activity report. Ex. 5, Phillips Dep. (Rough) at 195:7-11, 200:19-201:17

Further, IV disputes that the authorization processor is directly connected to database 32, because only the authorization *sub*processor 30 is taught with a connection to a database storing the authorization parameter tables 32. '275 patent, Figure 2 (emphasis added); Ex. 5, Phillips Dep. (Rough) at 150:14-25. Thus, the '275 patent does not teach that the authorization processor is directly connected to database 32.

**IV's Response to Capital One's Alleged Undisputed Fact No. 14**: IV disputes that the "only data source disclosed in the Visa patent" is the database storing the APT. The '275 patent expressly teaches that the normal or standard authorization system includes some form of storage including of the "issuer FI or network owner criteria for allowing [a] transaction." '275 patent, col. 3:26-30; Ex. 5, Phillips Dep. (Rough) at 140:2-15; 147:17-149:16; 193:7-20. The normal or standard system for authorizing a transaction is represented by the issuer bank network 18. '275 patent, Fig. 1, item 18; Phillips Dep. (Rough) at 136:7-24; 158:17-159:20. For example, the '275 patent states that the issuer FI has the issuer FI's criteria (such as the cardholder's credit limit) for determining whether to deny authorizations. '275 patent, col. 1:59-61; 3:28-30; 5:38-40; Ex. 5, Phillips Dep. (Rough) at 138:5-10.

**IV's Response to Capital One's Alleged Undisputed Fact No. 24**: IV disputes that a screenshot of the ShareBuilder web site is a display created by the user's web browser and that the ShareBuilder system itself does not generate the display shown on the user's computer. The html document generated by the ShareBuilder system is a web page as well as a display. Ex. 7,

Williams Decl. at ¶¶ 14-15; Ex. 9, Bailey Depo. Tr., pp. 17:19-18:5.

### III. THE '137 AND '382 PATENTS MEET THE PATENTABILITY REQUIREMENT OF SECTION 101

#### A. Capital One Makes Three Critical Errors That Pervade Its Section 101 Analysis and Warrant Denial of Its Motion

As set forth below, Capital One glosses over the law, glosses over the facts, and analogizes to cases involving inapposite patents.

#### 1. Capital One Improperly Glosses Over The Law

Capital One tells the Court – in several different ways – that abstract ideas are not patentable. Capital One Br. at 7-9. While that is a correct statement of law, Capital One never explains the test for determining what is an abstract idea and what is not. *Id.* This is no accident because the only way Capital One can argue that the patents-in-suit claim "abstract ideas" is (ironically) to argue in the abstract, untethered from the law. Capital One also asks the Court to ignore the teachings of *CLS Bank* and *Ultramercial* – two cases that are highly relevant, controlling, and the subject of pending Supreme Court review. Capital One Br. at 8-9. And, Capital One fails to apply four key Section 101 tenets that are unlikely to be affected by whatever the Supreme Court decides in *CLS Bank* and *Ultramercial*:

(1)     It has been the law for decades that if a patent claims the *application* of an abstract idea, rather than the idea itself, the claim is patent eligible.[4]

(2)     Relatedly, claims that have meaningful limitations that restrict the claim to an application are patent eligible.[5]

---

[4] *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1343 (Fed. Cir. 2013); *Bilski v. Kappos*, 130 S. Ct. 3218, 3230 (2010); *Gottschalk v. Benson*, 409 U.S. 63, 67; *Diamond v. Diehr*, 450 U.S. 175, 187 (1981); *see also Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1298 (2012) (referring to the application as the inventive concept).

(3)     Patent eligible claims typically reference material objects or specific examples and the machine or transformation test may be relevant to this inquiry.[6]

(4)     Claims cannot be stripped down, simplified, generalized or paraphrased to remove the concrete limitations in order to go hunting for an abstract idea.[7]

When these tenets are applied to the '137 and '382 patents, Capital One's motion unravels.

### 2.     Capital One Improperly Glosses Over The Facts

Capital One's second error is that it glosses over the facts.  While analysis under Section 101 is "ultimately a legal determination, [it] is rife with underlying factual issues" that must be resolved.  *Ultramercial*, 722 F.3d at 1339.  Examples of the underlying factual issues include whether the claimed invention is a specific application (and which limitations make it a specific application) and the scope of preemption (*i.e.*, how much of the field is "tied-up," an inquiry that involves historical facts and an identification of the field, the available alternatives, and the preemptive impact of the claims).   *Id.*

Despite a Section 101 inquiry being highly factual, Capital One does not recite a single "undisputed fact" at the outset of its motion relating to its Section 101 argument.  This is because Capital One tries to gloss over the specifics of the claimed inventions (*i.e.*, the facts), over-generalizing them to the point that they become meaningless.  But – as IV has shown before – the '137 and '382 patents are specific applications of database and website technology that are

---

[5] *Ultramercial*, 722 F.3d at 1344; *Mayo*, 132 S. Ct. at 1287, 1297; *CLS Bank Int'l v. Alice Corp.*, 717 F.3d 1269, 1281 (Fed. Cir. 2013).
[6] *Bilski*, 130 S. Ct. at 3227; *Ultramercial*, 722 F.3d at 1348-49.
[7] *Ultramercial*, 722 F.3d at 1344; *Diamond v. Diehr*, 450 U.S. 175, 188 (1981) ("[C]laims must be considered as a whole...").

necessarily machine driven rather than abstract concepts.  Capital One's Section 101 analysis is really just a series of high level arguments that – taken to their logical end – would preclude patentability of any advancement in database or website technology that takes advantage of devices and processes that were in prior use.  As discussed above, this is not the law.

### 3.   Capital One Improperly Analogizes The Patents-in-Suit To Patents In Inapposite Cases

 Finally, the cases that Capital One directly compare to the patents-in-suit in chart form are inapposite.  These cases involved different patents (that often involved no machine at all) and not specific applications to solve problems within the specific technological fields like the patents-in-suit.  Pointing to several common elements in claims is not the test for patentability under Section 101.

### B.   The Asserted Claims Of The '137 Patent Do Not Claim Abstract Ideas

Unpacking the three critical errors illuminates why Capital One's patent eligibility arguments fail because the asserted claims of the '137 patent cover a specific patent eligible application of database technology for electronically administering financial accounts, as opposed to an abstract idea.

Capital One resorts to hyperbole to support its assertion that the '137 patent covers an abstract idea and states that when "viewed broadly, the claims seek to encompass all use" of the "ancient idea" of self-imposing limits on categories of transactions "in a modern economy." Capital One Br. at 9.  If this were true Capital One would have prior art from hundreds if not thousands of years ago.  It does not and because it does not Capital One has to go to its fall back argument that the '137 patent "preempts the use of th[e] idea in a computer environment."  *Id*. But were that so, Capital One would not be debating whether certain limitations are of the '137 patent are found in the prior art and could not in good faith contest infringement.  *See infra*

7

Section IV.  Capital One cannot credibly assert that it does not have the claimed database (for purposes of non-infringement) while at the same time claiming that the '137 patent covers all computer implemented embodiments.

The reality is that the '137 patent claims a very specific way of an administering an account using an electronic database.  In accord with the claimed implementation, there must be a database that integrates profile data keyed to a user identify and transaction summary data that is then communicated to a device.  '137 patent, claim 5.  This is a specific, patent eligible application because it has concrete limitations that were just discussed and does not cover all ways of electronically administering an account or doing so using a database.  *See Ultramercial*, 722 F.3d at 1346-48; *Mayo,* 132 S.Ct. at 1300 (discussing a patent-eligible process claim that involved a law of nature but included additional steps "that confined the claims to a particular, useful application of the principle").

It is also readily apparent that the asserted claims pass the machine or transformation test. *See Ultramercial*, 722 F.3d at 1348.  The machine is the database storing a profiled keyed to a user identity that has categories/limits.  '137 patent, claim 5.  And transaction summary data is communicated to a receiving device.  *Id.*

Rather than accept that the relevant tests of Section 101 are met, Capital One claims that the components of the '137 patent are too generic because all that is really claimed in Capital One's view is a database.  Capital One Br. at 11-13.  Capital One has to skip over the actual invention to make that argument.  Capital One does this by impermissibly simplifying, generalizing and paraphrasing the claims of the '382 patent to remove the concrete limitations and proclaim an abstract idea.  *Id.*; *Ultramercial*, 722 F.3d at 1344.  Contrary to Capital One's assertion, the database is part and parcel of the invention because the invention is programming a

dynamic database such that it is keyed to individual profiles/identities and categories/limits.  This is the definition of a specifically programmed computer and one that was not done before the patent.  *In re Alappat*, 33 F.3d 1526, 1544-45 (Fed. Cir. 1994) ("[P]rogramming creates a new machine, because a general purpose computer in effect becomes a special purpose computer once it is programmed to perform particular functions pursuant to instructions from program software.").   By glossing over the invention, Capital One argues that there can be no advancement in the field of database technology because those inventions would "just involve a database."  That is far from the law.  A patent is invalid under Section 101only when it claims an idea itself and not an application of an idea.  Any specific application of database technology passes Section 101.

While Section 101 presents a factual inquiry, Capital One fails to show that relevant factual issues must be resolved in its favor.  Indeed, it does not attempt to show how or why the claims of the '137 patent do not claim a specific application (because they do).   Moreover, Capital One does not analyze preemption, because the claims of the '137 patent only claim specific ways of electronically administering financial accounts as opposed to all ways.  Capital One ignores these fact-based issues because they do not turn in its favor.

Finally, none of the patents in other cases to which Capital One tries to analogize the '137 patent are even relevant.  The chart on page 10 of Capital One's brief confirm that the patents in *Cybersource* and *Accenture* have no bearing on whether the '137 patent claims patent eligible subject matter.  The patent-at-issue in *Cybersource* claimed an "unpatentable mental process."  *Cybersource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373 (Fed. Cir. 2011). And the patent-at-issue in *Accenture* related to covered generating a task in response to events in the field of insurance.  *Accenture Global Services, GmbH v. Guidewire Software, Inc.*, 728 F.3d

1336, 1346 (Fed. Cir. 2013).  The comparison charts in Exhibit N to Capital One's motion make no sense and fail to support Capital One's position.  Highlighting phrases like "credit application data" and "funding decision" in *Dealertrack*, "generating an insurance policy" and "calculating a policy value" in *Bancorp*, and "information entered on a telephone" and "exploded data" in *Cyberfone*, is in no way helpful to determining whether a method and system for electronically administering financial accounts meets the requirements of Section 101.  These claims do not even involve nearly the same technology.  Because the fundamental test is whether the claims cover a specific application, comparing a few claim elements of one patent to another patent as Capital One does, is largely if not completely, an irrelevant exercise.

The claims of the '137 patent pass the "coarse filter" of Section 101.

### C.    The Asserted Claims Of The '382 Patent Do Not Claim Abstract Ideas

Here too, unpacking Capital One's analytical errors demonstrates why its patent eligibility arguments fail.  As an initial matter, what Capital One claims is the unpatentable abstract idea – "personalizing a website display to reflect the user's characteristics and navigation history" – is not abstract at all.  Capital One Br. at 13.  Rather, even as argued by Capital One, the '382 patent covers a specific application of customizing a website and not all ways of doing so.  *See Ultramercial*, 722 F.3d at 1339; *Bilski v. Kappos*, 130 S. Ct. at 3230; *Gottschalk*, 409 U.S. at 67; *Diamond*, 450 U.S. at 187; *Mayo*, 132 S. Ct. at 1298.

Indeed, there are numerous concrete limitations in asserted independent claims 1, 16 and 21, such as:  an "interactive interface," "dynamic web site navigation data" that is provided "to the user," "a display that depicts portions of the web site visited by the user as a function" either of "the website navigation data" or "the user's personal characteristics,"  "user profile attributes," and "data stream[s]."  '382 patent at claims 1, 16, 21.  These concrete limitations

conjunctively act to limit the claimed inventions to specific applications of web page technology and even more narrowly specific applications of customized web page technology.   *See Ultramercial*, 722 F.3d at 1352; *Mayo*, 132 S. Ct. at 1287, 1297; *CLS Bank*, 717 F.3d at 1299. The claims very clearly do not cover all ways of customizing web pages, much less all ways of presenting them, or else Capital One could not assert its non-infringement positions in good faith.

The Court's claim construction order also confirms that the '382 patent contains concrete limitations that limit the claimed invention to a specific application of website customization. For example, the Court construed "interactive interface" as "*a selectively tailored medium* by which a web site user communicates with a website information provider."  Claim Constr. Order, ECF No. 162, at 5.   Likewise, the "display depicting …" terms each includes "a web page manager," which is a particular machine with specialized software for customizing web pages based upon aspects of the user's profile and information identifiers from portions of the web site. *Id.* at 6-7.

Upon examining the meaningful limitations of the asserted claims of the '382 patent and how the claims have been construed, it is also clear that these claims pass the machine or transformation test.  Indeed, methods and systems involving selectively tailored mediums that change their displays based upon web page managers that analyze and use information from a user's profile as well as other portions of the web site a user has visited necessarily involve specific and highly specialized computer hardware and software. *Ultramercial*, 722 F.3d at 1348-49 ("At bottom, with a claim tied to a computer in a specific way, such that the computer plays a meaningful role in the performance of the claimed invention, it is as a matter of fact not likely to pre-empt virtually all uses of an underlying abstract idea, leaving the invention patent

eligible."). While the machine or transformation test is not necessarily dispositive, it is another relevant test for Section 101 that the '382 patent passes with flying colors.

Instead of looking to the relevant tests for patent eligibility, Capital One does what the Federal Circuit says it should not – Capital One simplifies, generalizes and paraphrases the claims of the '382 patent to remove the concrete limitations and, not surprisingly, discovers that only an abstract idea is left. Capital One Br. at 14; *Ultramercial*, 722 F.3d at 1244.[8] But Capital One cannot assert that the '382 claims only an abstract idea by stripping away the claim language.

But Capital One takes it one step further and makes the conclusory assertion that its stripped down version of the claims of the '382 patent "are akin to the steps of the invalidated claim in *Bilksi*." Capital One Br. at 14. The claims of the '382 patent are nothing like the claims in *Bilksi* as the *Bilski* claims covered the concept of risk hedging in all fields. *Bilski*, 130 S. Ct. at 3231. By stark contrast (both in scope and field), the '382 patent covers one specific application of customizing web pages (as opposed to all ways) and does not cover all ways of creating and customized communicating web pages to users.

Moreover, none of the patents in other cases to which Capital One tries to analogize the '382 patent are even relevant. Looking at the chart on pages 14-15 of Capital One's brief makes it obvious that the patents in *Cybersource* and *Accenture* have no bearing on whether the '382 patent claims patent eligible subject matter. Again, the patent-at-issue in *Cybersource* claimed an "unpatentable mental process" and the patent-at-issue in *Accenture* only covered generating a

---

[8] "The Court has long-recognized that any claim can be stripped down, simplified, generalized, or paraphrased to remove all of its concrete limitations, until at its core, something that could be characterized as an abstract idea is revealed. A court cannot go hunting for abstractions by ignoring the concrete, palpable, tangible limitations of the invention the patentee actually claims."

task in response to events. *Cybersource*, 654 F.3d at 1373; *Accenture*, 728 F.3d at 1346. Finally, the comparison charts in Exhibit O to Capital One's motion make no sense and fail to support Capital One's position. Highlighting phrases like "credit application data" and "funding decision" in *Dealertrack*, "generating an insurance policy" and "calculating a policy value" in *Bancorp*, and "information entered on a telephone" and "exploded data" in *Cyberfone* is in no way helpful to determining whether a method and system for customizing web pages is patent eligible. These claims do not even involve nearly the same technology.

Assuming comparing patents were a relevant exercise, Capital One ignored the patent that is most analogous to the claims of the '382 patent – the asserted patent in *Ultramercial*. In *Ultramercial*, the claims were upheld because they recited a specific application for monetizing/distributing copyrighted material and made use of an extensive computer interface with multiple steps and complex computer programming. *Ultramercial*, 722 F.3d at 1350-52. Again, analogy to patents in other cases is not the proper inquiry, the *Ultramercial* patent is the most analogous to the '382 patent of any case cited by either party.

Finally, despite being a highly factual inquiry, Capital One fails to even attempt to show that the relevant factual issues should be resolved in its favor. Indeed, it does not attempt to show how or why the claims of the '382 patent do not claim a specific application (because they do). Moreover, Capital One does not analyze preemption (because the claims of the '382 patent only claim one way of customizing web pages as opposed to all ways). Capital One ignored these fact-based issues because they do not turn in its favor. The claims of the '382 patent are patent eligible under Section 101 and Capital One's motion on this basis should be denied.

IV.    **THE '137 PATENT IS VALID OVER THE '275 PATENT**

A.    **The Tannenbaum '137 Patent Claims A Particular Database That Is Not Anticipated By The '275 Patent**

The lynch pin of Capital One's invalidity case is whether the '275 patent discloses the database element as required by asserted claim 5 of the '137 patent. Critical to the '137 patent is "storing, in a database, a profile keyed to a user identity and containing one or more user-selected categories [and] a user pre-set limit" as well as "transaction summary data in the database." '137 patent, claim 5, 10:5-12. There is no dispute concerning the significance and requirements of the database element in claim 5. Ex. 5, Phillips Dep. (Rough) at 68:21-70:10. Capital One's expert, Dr. Robert Phillips, acknowledges that the database of claim 5 requires a profile keyed to a user identity that has at least one user selected category to track transactions that includes a user preset limit **and** transaction summary data. *Id.* The recited database is the backbone of claim 5 of the '137 patent, and a database meeting these requirements is nowhere disclosed in the prior art '275 patent.

The omission of the claimed database from the '275 patent is not a mistake or oversight, but instead reflects the very different approach taken by the inventors of the '275 patent. The '275 patent is an add-on system to a preexisting authorization processing system that used standard or normal authorization techniques to approve or deny credit card transactions. Ex. 5, Phillips Dep. (Rough) at 158:17-159:20; '275 patent, 3:27-30, Figure 3. The preexisting authorization processing system includes what is represented in Figure 1 of the '275 patent. Ex. 5, Phillips Dep. (Rough) at 146:14-147:16,158:17-159:20. Figure 1 includes an issuer bank network that either includes the banks within it or simply sends the information about the desired transaction to the appropriate bank and the bank then either authorizes the transaction or not. Ex. 5, Phillips Dep. (Rough) at 136:7-24; '275 patent, 2:49-60, Figure 1. To complete an

authorization, the issuer bank network tests the transaction against multiple criteria. '275 patent, 3:28-30. One such criterion is the account credit limit. Ex. 5, Phillips Dep. (Rough) at 138:5-10.

Contrary to the purported facts proffered in Capital One's motion, Capital One's expert freely admitted that the process required the issuer bank network to store all kinds of information, including account numbers, credit limits, and information about transactions on the account. Ex. 5, Phillips Dep. (Rough) at 140:2-15; 147:17-149:16. As such, the issuer bank network, as well as the network owner, identified as VISANET in Figure 1 of the '275 patent, are all sources of data for the authorization process. Ex. 5, Phillips Dep. (Rough) at 193:7-20. The materiality of Capital One's expert's confession on this point cannot be overstated: It is fatal to Capital One's motion for summary judgment.

This confession is fatal because the focus of the '275 patent is the addition of a distinct authorization subprocessor that provides a separate level of authorization in addition to the standard authorization process discussed above. Ex. 5, Phillips Dep. (Rough) at 150:14-25; '275 patent, 3:33-35. The '275 patent's authorization subprocessor is shown in Figure 2. '275 patent, Figure 2, item 30. The authorization subprocessor uses cardholder-provided parameters to provide a second level of authorization based on whether the transaction conflicts with any parameters. '275 patent, 1:3-10, 3:1-6, 3:35-38. To store the newly-created, cardholder-provided authorization parameters, the '275 patent describes authorization parameter tables (APTs) that are stored in a newly required database. '275 patent, 3:1-8. The parameter information stored in the APTs is described in the '275 patent in detail. '275 patent, 4:64-4:54. Nowhere does the '275 patent state or imply that anything other than parameter information is stored in the APT database. Ex. 2, 2/14/14 Expert Report of John Hiles Regarding Validity of

U.S. Patent No. 8,083,137 at ¶¶ 55-56; Ex. 5, Phillips Dep. (Rough) at 177:6-14; '275 patent, 3:64-4:54.

Even if the APT database were integrated with components of the authorization system, the '275 patent still lacks any direction to modify the APT database to include transaction details. Ex. 2, 2/14/14 Expert Report of John Hiles Regarding Validity of U.S. Patent No. 8,083,137 at ¶¶55-57; '275 patent, 5:38-40.  Thus, the '275 patent does not disclose the database of the '137 patent reciting a profile keyed to a user identity that has at least one user selected category to track transactions that includes a user preset limit **and** transaction summary data.  Ex. 2, 2/14/14 Expert Report of John Hiles Regarding Validity of U.S. Patent No. 8,083,137 at ¶¶55-57. Because the APT database of the '275 patent does not include transaction summary data, the '275 patent does not anticipate the claims.

Capital One's motion and its related expert reports attempt to fill-in this omission by arguing that the APT database must store transaction summary data because the APT database "is the only data source disclosed in the ['275] Visa patent."  Capital One Br. at 5, 20; Ex. T, 2/28/14 Rebuttal Expert Report of Robert Phillips Regarding Invalidity ¶¶40-41; Ex. H, 2/28/14 Rebuttal Expert Report of Robin O'Connell Regarding Validity of U.S. Patent No. 8.083,137 ¶¶ 29 ("The Visa ['275] patent discloses no other source for data other than the database in Figure 2").  Capital One's argument now points to an expert report of Robin O'Connell, one of the inventors of the '275 patent that amounts to nothing more than an inventor's improper attempt to broaden the four-corners of a patent through incompetent and irrelevant testimony.  *In re Omeprazole Patent Litig.*, MDL-21-81, 2000 WL 1145399, at *8 (S.D.N.Y. Aug. 1, 2000). Capital One's attempt to fill-in the omitted disclosure cannot succeed for multiple reasons.

First, the '275 patent expressly describes that multiple sources of data exist in the '275

patent, including the issuing bank and network (VISANET) owner.  '275 patent, 1:24-30, 3:27-35, Figure 1.  In fact, the '275 patent expressly discloses that the issuer financial institution (FI) or bank is the source of the transaction details that are used by the authorization subprocessor.  '275 patent, 3:33-35.  Second, Capital One's own expert could not maintain Capital One's position.  Dr. Phillips admitted that the issuer bank network stored information about the cardholder.  Ex. 5, Phillips Dep. (Rough) at 140:2-15; 147:17-149:16.  Dr. Phillips could not deny that there are many data sources disclosed in the '275 patent.  Ex. 5, Phillips Dep. (Rough) at 193:7-20.

Capital One's false statement regarding the APT database status as "the only data source disclosed in the ['275] Visa patent" is fatal to the motion for summary judgment.  Because the transaction details of the '275 patent are described as stored by the issuer financial institution, and not the local APT database, that facts on which Capital One premised its motion are not merely disputed, but proven wrong.  Stated simply, the '275 patent cannot be argued to show the database of claim 5 that requires a profile keyed to a user identity that has at least one user selected category to track transactions that includes a user preset limit *and* transaction summary data.  Ex. 5, Phillips Dep. (Rough) at 68:21-70:10.

**B.     The Tannenbaum '137 Patent Is Not Rendered Obvious By The '275 Patent**

Capital One invites the Court to find the asserted claims obvious based solely on the argument that it would have been obvious to store the transaction details of the '275 patent in a database, such as database 32.  Capital One Br. at 21.  Capital One's argument is wholly disconnected from the disclosure of the '275 patent, which discloses that transaction details are stored in a location far from the APT database.  Specifically, as highlighted above in IV's opposition to Capital One's anticipation arguments, IV and Capital One's experts are in

agreement that the '275 patent does disclose and teach that the transaction details are stored at the issuer bank or financial institution or the network owner (e.g., VISANET). Ex. 5, Phillips Dep. (Rough) at 140:2-15, 147:17-149:16, 193:7-20. Capital One also repeats that the APT database "is the only data source disclosed in the Visa patent," which is contrary to the express disclosure of the '275 patent and contradicted by Capital One's own expert admitting that transaction data was already stored by the issuer bank or financial institution, or by the network owner. '275 patent, 1:24-30, 3:27-35, 140:2-15, 147:17-149:16, Figure 1. Thus, there is no reason whatsoever to modify the APT database of the '275 patent to attempt to store the transaction details provided from the issuer bank or financial institution or the network owner.

In fact, the very architecture of the '275 patent's authorization subprocessor teaches a person of skill in the art not to use the APT database to store transaction details. Ex. 2, 2/14/14 Expert Report of John Hiles Regarding Validity of U.S. Patent No. 8,083,137 at ¶ 57; '137 patent, 3:33-35. The identification of the subprocessor as an add-on to the normal or standard authorization system, delineates a separateness between the issuer financial institution (FI) and the authorization subprocessor. Ex. 5, Phillips Dep. (Rough) at 158:17-159:20; '275 patent, 3:27-30, Figure 3. As such, the '275 patent teaches the opposite of what is recited in claim 5 as a database with a profile keyed to a user identity that has at least one user selected category to track transactions that includes a user preset limit *and* transaction summary data. Ex. 4, 3/17/14 Hiles Second Supplemental Report at ¶ 6.

Any modification of the '275 patent to include the claimed '137 profile database would be wrought with unpredictability and would defy common sense. Ex. 4, 3/17/14 Hiles Second Supplemental Rebuttal Infringement and Supplemental Invalidity Report at ¶ 6; Ex. 2, 2/14/14 Expert Report of John Hiles Regarding Validity of U.S. Patent No. 8,083,137 at ¶¶ 57. The

modification of the APT database to also store transaction details would not make sense for several reasons.  Ex. 4, 3/17/14 Hiles Second Supplemental Rebuttal Infringement and Supplemental Invalidity Report at ¶¶ 6-7.

First, this modification would dramatically expand the APT database to include an immense amount of transaction data that is many orders of magnitude larger than profile information.  Ex. 5, Phillips Dep. (Rough) at 204:8-205:15; Ex. 4, 3/17/14 Hiles Supplemental Rebuttal Infringement and Supplemental Invalidity Report at ¶¶ 6-7.  Second, if transaction summary details were added to the APT database 32 of the '275 patent, the database would change dramatically from a database that is relatively static to a transaction details database that is constantly being subject to large amounts of changing data.  Ex. 4, 3/17/14 Hiles Supplemental Rebuttal Infringement and Supplemental Invalidity Report at ¶ 6.  Third, a person of ordinary skill in the art would not modify the APT database of the '275 patent to include transaction details because the modification would result in duplicate information stored in multiple places since the '275 patent teaches that transaction details are already stored by issuer bank (or FI) or network owner.  Ex. 5, Phillips Dep. (Rough) at 202:3-203:18; Ex. 4, 3/17/14 Hiles Supplemental Rebuttal Infringement and Supplemental Invalidity Report at ¶ 6.

Aside from revealing a hindsight approach to the validity analysis, Capital One fails to make the requisite showing of obviousness.  The modifications suggested by Capital One to the '275 patent clearly introduce a level of complexity and unpredictability that precludes summary judgment of obviousness.  Further, the '275 patent actually teaches away from Capital One's proffered obviousness modification because the '275 patent actually teaches that transaction details are already stored by issuer financial institution of network owner.  Ex. 5, Phillips Dep. (Rough) at 140:2-15, 147:17-149:16.  Mr. Hiles' opinion is unchallenged and fully supported not

only by the common sense of one of ordinary skill in the art, but also by the secondary considerations of non-obviousness which support the validity of claims 5-11 of the '137 patent. Ex. 2, 2/14/14 Expert Report of John Hiles Regarding Validity of U.S. Patent No. 8,083,137 at ¶57.  Capital One's motion for summary judgment of obviousness must therefore be denied.

## V.    CAPITAL ONE IS NOT ENTITLED TO SUMMARY JUDGMENT REGARDING THE DOCTRINE OF EQUIVALENTS

Capital One failed to present the full disclosure of the Doctrine of Equivalents ("DOE") positions provided by Professor Hiles in his expert report related to the "user-selected categories" element.  Ex. 3, 2/28/14 Hiles Rebuttal Report on Infringement at ¶¶ 69, 110, 159 & 210.  To the extent Capital One is referring to preliminary DOE positions for other elements disclosed by Mr. Hiles, the motion is misguided (and not supported by proper meet-and-confer) because IV does not intend to present DOE to the jury outside of the identified paragraphs above pertaining to the "user-selected categories" element.

The proper level of detail is demonstrated by the example shown below:

> 210.    Claim element [a] is literally satisfied by Capital One's EOS system functionality and is present under the doctrine of equivalents.  Dr. Phillips argues that the EOS system does not include "user-selected categories" under his flawed reconstruction of the term.  Nonetheless, even under the view taken by Dr. Phillips that the claim requires "a way to group or classify something," the EOS system satisfies that interpretation (not only literally) but equivalently.  According to Dr. Phillips, the function of the element of the claim is to track transactions.  Similarly, the existence of the "Transaction over X" functionality of the EOS system is to track transaction, and thus the function of each is the same or at the very least substantially similar.  The way that the claim element accomplishes tracking transactions is by implementation of database technology and communicating.  Similarly, within EOS, the way of tracking transactions is in the same or substantially similar in that EOS implements database technology and communications.  The result is also the same or substantially similar as both provide alert information through one or more communications.  Thus, any differences between Capital One's EOS functionality and element [a] are insubstantial.

Ex. 3, 2/28/14 Hiles Rebuttal Report on Infringement at ¶¶ 210. Professor Hiles sworn declaration under 28 U.S.C. § 1746 is specific, not only to the claimed element, but is narrowed to the one opinion of non-infringement offered by Capital One's expert pertaining to three words of the claim: "user-selected categories." Thus, Mr. Hiles' testimony is provided on an even narrower basis than the limitation-by-limitation analysis required.

 Ex. 5,

Phillips Dep. (Rough) at 294:9-295:20, 299:17-300:6. This case is plainly not one where summary judgment can be granted for defendants under DOE.

## VI. CAPITAL ONE IS NOT ENTITLED TO SUMMARY JUDGMENT OF NON-INFRINGMENT OF THE '137 PATENT BECAUSE VISS INFRINGES

Capital One misapprehends the relevance of the "merchant categories" functionality within VISS and disregards the actual allegation of infringement explained at length by IV's expert, Professor Hiles.  Thus, Capital One's is not entitled to summary judgment of non-infringement for the "merchant category" functionality in the accused VISS system. The functionality within VISS accused of meeting the "individual user-selected categories include[ing] a user preset limit" is the "Transaction above X" alert of VISS.  Ex. 4, Hiles Supplemental Report on Infringement at ¶¶ 65 (see Ex. 6, IV-CAPONE0250578).  It is true that the presence of the "merchant categories" is probative evidence of VISS's infringement because the presence of the merchant categories confirms that the "transaction over X" is user-selected – since the user could select from either the "merchant categories" or the "transaction over X" category.  Ex. 4, Hiles Supplemental Report on Infringement at ¶¶ 66 (see Ex. 6, IV-CAPONE0250578); Ex. 3, 2/28/14 Hiles Rebuttal Report on Infringement at ¶¶ 66-67.   Further, to the extent Capital One contends that claim 5 requires more than one user-selected category in a system, the "merchant categories" plus the "Transaction above X" satisfy the multiple "user-selected" categories aspect of claim 5.

In this role of showing "user-select[ion]," the merchant categories functionality is probative of infringement even without any showing that the merchant category has an associated limit or that users actually select the merchant categories.  Ex. 3, 2/28/14 Hiles Rebuttal Report on Infringement at ¶¶ 66-67.  Simply, the presence of the merchant category functionality proves that merchant categories are actually selected by users in order to prove that that a user is making a selection among more than one category.  Ex. 4, Hiles Supplemental Report on Infringement at ¶¶ 181-187; 66 (see Ex. 6, IV-CAPONE0250578). The "user-selected" limitation is satisfied so long as merchant categories are among the categories that a

user could select, regardless of whether they are in fact selected.  It is the "transaction over X" category that includes a user-preset limit.  It is the "merchant categories" that shows that the categories are selectable from more than one category.  Thus, Capital One's piecemeal request for summary judgment of non-infringement of one discrete part (the merchant categories) of a larger infringement allegation of infringement of the VISS system is not appropriate prior to a jury trial of infringement of the VISS system as accused.

## VII.    THE '382 PATENT IS VALID UNDER 35 U.S.C. § 112(B)

Capital One rehashes one of the arguments raised in its Motion for Judgment on the Pleadings that "interactive interface" is indefinite.  The '382 patent meets the definiteness requirement because a skilled artisan would not find the asserted claims to be "insolubly ambiguous."[9]  Indeed, the Court was able to construe "interactive interface."  In its second attempt at this same defense, Capital One merely appends a declaration by its technical expert but without analysis or explanation as to how this declaration satisfies the clear and convincing burden that Capital One failed to carry in its first attempt.

Capital One bears a heavy burden to show a claim is indefinite.  "If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds."  *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001).  The meaning of the claim clearly is discernable, since the Court construed "interactive interface" in light of the intrinsic evidence to be "a selectively tailored medium by which a website user communicates with a web site information provider."  ECF No.

---

[9] Despite only presenting one argument in its summary judgment brief, Capital One footnotes that it "adopts and incorporates" its earlier arguments from its Motion for Judgment on the Pleadings.  To the extent the Court considers the prior arguments not specifically re-raised by Capital One, IV incorporates the arguments it made in opposition.  ECF No. 226.

162 at 5.  This should foreclose the issue and Capital One's indefiniteness defense should fail as a matter of law.  *Exxon*, 265 F.3d at 1375.

Despite the fact that the Court has construed the term "interactive interface," Capital One maintains the term is indefinite because neither IV's expert Dr. Williams nor the specification delineates explicitly what hardware must be part of the interactive interface.  This argument misses the point.  The invention of the '382 patent claims using software to customize a web page based on other web pages the user has visited and user profile information.  Ex. 7, Williams Decl. at ¶¶ 7-8.  That customized content can then be delivered to the individual user in a variety of ways.  The patent is not about general use of the Internet or general web content delivery.  It is about the process of creating and delivering customized web pages.  The Court recognized this in its claim construction order when discussing the "display" of the customized content (which is one of the elements of the interactive interface):  "In this regard, the Court concludes that the word 'display' does not refer to a physical device but rather a pictorial or graphic depiction shown to the user…[w]hile that pictorial or graphic image would have to be viewed on an electronic device…the claimed invention is not of that device itself, but rather a method for obtaining and displaying information…"  ECF No. 162 at 6.  The customized content must be sent over the Internet.  But how that happens – whether using certain servers, routers, or other network infrastructure – is immaterial.  *See* '382 patent, Fig. 3, 3:40-47.

The patent did not need to specify precisely what hardware is necessary as Capital One contends.  One of skill in the art would understand that the customized content can be delivered over the Internet using many different combinations of hardware or network technology.  It is not incumbent upon an inventor to catalog each possible permutation in order to satisfy § 112.

Because the Court discerned the meaning of "interactive interface," the '382 patent is sufficiently definite as a matter of law.  *Exxon*, 265 F.3d at 1375.

## VIII.   CAPITAL ONE INFRINGES THE '382 PATENT

### A.   ShareBuilder Automatically Downloads a User Profile

Capital One argues that its ShareBuilder system does not "automatically download" a user profile.  But to make its argument, Capital One was required to add two additional limitations that are not in the Court's claim constructions, not in the claims, not in the specification, and are contrary to the plain and ordinary meaning of the phrase "automatically downloads."  Capital One now says that that "automatically downloading" means:  (1) that a user can *never* be required to enter a user profile; and (2) that a user can *never* be required to use a password to log into a web site.  Capital One Br. at 27.  It did not argue these points as part of claim construction, and neither limitation has any support in the '382 patent.  Once the error of Capitol One's late claim construction arguments are realized, it is plain that ShareBuilder does automatically download user profiles and Capital One infringes.

1.   Creating a User Profile Does Not Preclude Infringement the '382 Patent.

Capital One fashions these limitations from statements describing the preferred embodiment.  The first says that one of the invention's most beneficial features no longer needing to "input a lot of mundane and unnecessary information."  Capital One Br. at 27 (citing '382 patent at 6:18-21).  From that, Capital One extrapolates a requirement that a user can *never* manually input any information and *never* be required to create an account profile.  But not having to enter "a lot of mundane and unnecessary information" information does not preclude at least the limited, necessary information a user would have to enter for establishing a user profile.

Thus, the part of the specification Capital One relies on does not support its new claim construction.

Further, the asserted claims themselves require the receipt of user profile information. For example, claim 16 includes the limitation:  "receiving data which defines a plurality of user profile attributes in each of a plurality of user profiles."  '382 patent at 8:19-20.  And the patent specification teaches that a user does in fact have to fill out profiles: "As shown, the information user **12, 14, 16, 18** may tailor their information user profile as needed to acquire specific information."  '382 patent at 3:45-47; Figs. 4A, 4B; 3:40-4:26.

2.  Entering a Password Does Not Preclude Infringement the '382 Patent.

Capital One again extrapolates a new claim limitation—that no password can be required to enter into a website—based on a single statement in the description of a preferred embodiment.  In the context of a particular embodiment, one discussing a public web site where a user would find coupons or product warranty information, the inventor noted that "the system allows the information provider to selectively provide information…without irking the information user by telling them they need a password, or they need to be a member."  Capital One Br. at 27 (quoting '382 patent, 6:39-42).  But not requiring a password in one embodiment does not preclude requiring a password in any embodiment.  One skilled in the art would understand that this one statement about access to websites, which do not contain sensitive private information, would not be applicable to access to websites that do include sensitive private information.  While it might "irk" a user to require the user to always enter a password when visiting certain public web sites (such as is being described in this particular embodiment), that would not be the case for web sites that include private or sensitive information of a user (*e.g.*, a user's financial information).  Ex. 7, Williams Decl. at ¶¶12-13.  Information users expect to see and rely on passwords, (i.e., initial user authentication), to enter into certain web sites that are not open to the public or contain information that is sensitive to a user.

It is immaterial for purposes of infringement that a user may initially need to create an account profile or enter a password.  There is no support in the claims or the teachings of the patent that the invention ***never allows*** a user to create a profile or enter a password.  These are untimely claim construction arguments asserted now in order to escape infringement.  Once rejected, it is clear that ShareBuilder infringes.

3.  ShareBuilder Downloads a Profile From the Interactive Interface

**B.  ShareBuilder Provides a Display As Taught by the '382 Patent**

Capital One admits that when a user visits ShareBuilder they are presented with web pages depicting portions of the ShareBuilder website visited by the user. Capital One's argument, however, is that because the code to generate those pages is ultimately displayed by the user's computer or web browser, it is outside the scope of the ShareBuilder system. Not so. The Court was clear in construing the "display" terms that the invention is not about the particular device for displaying a web page, "but rather a method for obtaining and displaying information based on a user's profile." ███████████████████████

███████████████████████████████████████████████



██████████████████████████████ This code is generated and obtained by and through the interactive interface to provide displays exactly as is taught by the '382 patent.



FIG. 5A

The patent teaches that the display should be thought of in terms of "data streams" (elements 310-324). These data streams represent the selective content that are created based on the

user profile or the web pages visited by that specific user.  After the data streams are created, they are sent to the user via the "selectively tailored medium by which a web site user communicates with a web site information provider"—the construed "interactive interface."  The claims themselves support this reading.  The display limitations are claimed as aspects of the interactive interface—in other words, they are elements of the selectively tailored medium that creates and transports content.  This is what is depicted in Figure 5A, shown above.  This is also what is depicted in Capital One's own diagram, also shown above.  The data streams are analogous to the green box labeled "HTML Website" being sent over the Internet.  The invention is not about a web browser reading code.  It is about the creation of that code for individual users based on that individual user's activity.  In the words of the inventor, the claimed invention is about "delivering information from an information provider to an information user that is selectively tailored towards the capabilities of the information provider and the needs of the information user."  *Id.* at 2:3-6.

At the very least, there is a dispute of fact concerning this term.  Based, however, on Capital One's representations and its own expert's report, the Court could find as a matter of law that ShareBuilder ***does*** provide a display as claimed in the patent.

## IX.    CONCLUSION

For the foregoing reasons, Capital One's motion should be denied.


Dated: March 17, 2014                         Respectfully submitted,

                                              /s/ Craig C. Reilly
                                              Craig C. Reilly VSB # 20942
                                              111 Oronoco Street
                                              Alexandria, Virginia 22314
                                              TEL:   (703) 549-5354
                                              FAX:   (703) 549-2604

E-MAIL: craig.reilly@ccreillylaw.com
*Counsel for Plaintiffs*


Ian Feinberg
Elizabeth Day
Marc Belloli
Clayton Thompson
FEINBERG DAY ALBERTI & THOMPSON LLP
1600 El Camino Real, Suite 280
Menlo Park, CA  94025
(650) 618-4364 (T)
(650) 618-4368 (F)
cthompson@feinday.com
ifeinberg@feinday.com
eday@feinday.com
mbelloli@feinday.com
*Counsel for Plaintiffs Intellectual Ventures I LLC*
*and Intellectual Ventures II LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2014 I filed the foregoing pleading or paper through the

Court's CM/ECF system which sent a notice of electronic filing to the following attorneys for

defendants:

Robert A. Angle
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia  23219
robert.angle@troutmansanders.com

TS-CapOne_IV@troutmansanders.com
Matthew J. Moore
Abbott B. Lipsky, Jr. (*pro hac vice*)
Jonathan D. Link (VSB No. 42951)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
matthew.moore@lw.com
tad.lipsky@lw.com
Jonathan.link@lw.com

Jeffrey G. Homrig
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025-1008
jeff.homrig@lw.com

Joseph H. Lee
LATHAM & WATKINS LLP
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626-1925
joseph.lee@lw.com

Neil A. Rubin
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, CA 90071-1560
neil.rubin@lw.com

Andrew J. Fossum
LATHAM & WATKINS LLP
811 Main Street, Suite 3700
Houston, TX 77002
andrew.fossum@lw.com

CAPITALONEIV.LWTEAM@lw.com

*/s/ Craig C. Reilly*
Craig C. Reilly VSB # 20942
111 Oronoco Street
Alexandria, Virginia 22314
Tel: (703) 549-5354
Fax: (703) 549-2604
E-mail: craig.reilly@ccreillylaw.com
*Counsel for Plaintiffs*